IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------------------)
OCEANA, INC.                             )
2501 M Street, NW, Suite 300             )
Washington, DC 20037-1311                )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )          Civil Action No. _____
                                         )
CARLOS M. GUTIERREZ, in his official     )
capacity as Secretary of the United States )
Department of Commerce                   )
Office of the Secretary                  )
Room 5858                                )
14th Street and Constitution Ave., NW    )
Washington, DC 20230;                    )
                                         )
NATIONAL OCEANIC AND                     )
ATMOSPHERIC ADMINISTRATION               )
Department of Commerce                   )
Room 5128                                )
14th Street and Constitution Ave., NW    )
Washington, DC 20230; and                )
                                         )
NATIONAL MARINE FISHERIES SERVICE )
Department of Commerce                   )
Room 14636                               )
1315 East-West Highway                   )
Silver Spring, MD 20910                  )
                                         )
                    Defendants.          )
_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This case concerns the fundamental data collection methodology for all thirteen

federal fisheries in the waters of the Northeast United States.  Federal fisheries law requires that

for each fishery the fishery management plan must establish a data collection methodology,

known as a standardized bycatch reporting methodology, to assess the amount and type of

bycatch (unintended catch that is often discarded, dead or dying). Because many of the vessels in the Northeast fisheries use unselective gear such as large trawl nets and long gillnets, the amount of bycatch in these fisheries is significant. Information collected on the amount and type of bycatch is crucial to devising and carrying out conservation policies mandated by law and central to sustaining marine fisheries and healthy ecosystems, such as the prevention of overfishing, the recovery of already overfished fish populations, the protection and recovery of protected species such as threatened loggerhead sea turtles, and the minimization of the waste resulting from bycatch.

2.      On January 28, 2008, defendants, the National Marine Fisheries Service, et al., (hereinafter, "the Fisheries Service") issued a Final Rule purporting to establish a standardized bycatch reporting methodology for the thirteen Northeast United States federal fisheries. Final Rule, Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment ("SBRM"), 73 Fed. Reg. 4736, 4737 (Jan. 28, 2008).

3.      The SBRM did not comply with the statutory mandate. It contains fatal flaws that threaten to cripple the ability of the Fisheries Service to maintain sustainable and economically viable commercial fisheries in the Northeast region, threaten the sustainability of state fisheries affected by bycatch in federal fisheries, and jeopardize the continued existence and recovery of protected species.

4.      For example, the flawed SBRM will not apply its statistical performance standard for the allocation of observer coverage to important species targeted in state fisheries, such as striped bass and shad. Consequently, the Fisheries Service will not collect statistically reliable information on the amount and type of the bycatch in federal fisheries affecting these commercially and recreationally important state fisheries.

5.      Furthermore, the SBRM contains a vast loophole which allows the Fisheries Service, on its own initiative and without independent review, to avoid applying the statistical performance standard in any year in which it deems that there are operational constraints that prevent it from fully implementing the SBRM.  The SBRM sets forth no standards for determining whether such operational constraints exist.  Furthermore, the SBRM does not require that the Fisheries Service identify alternative methods of satisfying the performance standards if there are such operational constraints.  Thus, for each such year, it may be that there will be no statistically reliable information collected on the amount and type of bycatch of any species.

6.      Because the flawed SBRM will not collect statistically reliable data, federal and state fisheries managers will not be able to accurately assess the condition of fish populations to determine if they have been overfished or are threatened with overfishing.  Nor will fisheries managers be able to enforce caps on fishing levels designed to prevent overfishing, because the fisheries managers will not have statistically reliable information as to the amount and type of the bycatch component of the overall catch in each fishery.

7.      Because the flawed SBRM will not ensure that the Fisheries Service collects statistically reliable data, federal fisheries managers will likewise not be able to accurately assess the condition of protected species populations, nor will they be able to enforce caps on incidental take levels designed to prevent jeopardy of extinction and allow the recovery of the protected species.

8.      Notwithstanding the extensive cumulative environmental impacts of this major federal action, the Fisheries Service conducted an Environmental Assessment ("EA") and issued

a Finding of No Significant Impact ("FONSI"), rather than conducting the legally-required

Environmental Impact Statement ("EIS").

9.      Accordingly, Oceana brings this lawsuit to compel the Fisheries Service to

reconsider the SBRM, to take a hard look at its environmental impacts in an EIS, and to establish

a standardized bycatch reporting methodology that will produce the statistically reliable

information on the amount and type of bycatch in the Northeast federal fisheries that is required

to manage them sustainably in compliance with controlling law.

## JURISDICTION AND VENUE

10.     This action arises under the Magnuson-Stevens Fishery Conservation and

Management Act, 16 U.S.C. § 1855(f); the National Environmental Policy Act ("NEPA"), 42

U.S.C. §§ 4321-4370e; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

11.     This Court has jurisdiction over this action by virtue of the Magnuson-Stevens

Act, which provides that "the district courts of the United States shall have exclusive jurisdiction

over any case or controversy arising under" the Magnuson-Stevens Act, 16 U.S.C. § 1861(d),

and that regulations promulgated under the Act shall be subject to judicial review "if a petition

for such review is filed within 30 days after the date on which the regulations are promulgated or

the action is published in the Federal Register, as applicable," *id.* § 1855(f).

12.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the

district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the

United States" and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any

action in the nature of mandamus to compel an officer or employee of the United States or any

agency thereof to perform a duty owed to the plaintiff."

13.     Jurisdiction is also found under the APA, 5 U.S.C. § 706, which authorizes a

court to "set aside agency action, findings, and conclusions found to be … arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law," and 5 U.S.C. § 704, which

provides a right to judicial review of all "final agency action for which there is no other adequate

remedy in a court."

14.     Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e).

15.     The Court may issue a declaratory judgment in this case pursuant to 28 U.S.C.

§§ 2201-2202, and may grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§

1861(d) and 1855(f), and the APA, 5 U.S.C. § 706.

## PARTIES

16.     Plaintiff Oceana, Inc., is a non-profit international advocacy organization

dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law,

and public education.  Oceana has over 20,678 members around the world, including over 4,800

members in the coastal states from Maine to North Carolina.  Oceana is organized under the laws

of the District of Columbia, and maintains its headquarters in Washington, DC.  It has offices or

staff in six states (Alaska, California, Florida, Massachusetts, New York, and Oregon) and three

foreign countries (Chile, Belgium, and Spain).  Through its policy, scientific, litigation, and

grass-roots activities, Oceana has been a prominent advocate for the collection of statistically

reliable fisheries data and the conservation of marine resources.  In particular, Oceana has long

advocated for the conservation of marine fisheries through the "count, cap, and control"

approach, which emphasizes statistically reliable fisheries data collection as the fundamental

"count" component to management.  Oceana has participated in administrative proceedings

before government agencies, litigated before courts, and issued reports to the public, all in the

service of protecting marine resources and wildlife.

17.     Oceana's members, supporters, staff, officers, and directors (hereinafter, "members") use and enjoy the oceans for numerous activities, including fishing, scuba diving, snorkeling, boating, swimming, beach walking, research, and study.  Oceana's members value a healthy marine environment.  They are concerned about and directly affected by environmental injury caused by unsustainable fishing practices in Northeast fisheries.  Such injuries include injury to their interest in commercially or recreationally fishing fish populations that are depleted as a result of unsustainable management caused, in part, by inadequate data collection, and injury to their ability to observe and study sea turtle populations that continue to be depleted because of unsustainable management caused, in part, by inadequate data collection.

18.     Oceana's staff reviews and analyzes fisheries bycatch data in order to advance Oceana's mission of conserving marine resources.  Oceana's staff has used this data to inform Oceana's members and the public on the condition of marine resources and to advocate for better policies to conserve Northeast commercial and recreational fisheries and to protect endangered and threatened sea turtles.  The failure to collect statistically reliable data on the amount and type of bycatch injures the ability of Oceana and its staff to inform Oceana's members and to accomplish its mission of participating in marine policymaking in order to develop management measures that will sustain our marine resources.

19.     Oceana and its members suffer direct and immediate injury as a result of the Fisheries Service's failure to establish a standardized bycatch reporting methodology that collects statistically reliable data.  These interests will continue to be impaired unless the Court grants the relief requested herein.

20.    Defendant Carlos M. Gutierrez is Secretary of the United States Department of Commerce.  He is sued in his official capacity as the chief officer of the federal department charged by the United States Congress with managing United States marine fisheries.

21.    Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of Commerce has delegated responsibility for managing United States marine fisheries to NOAA, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

22.    Defendant National Marine Fisheries Service is an agency of the United States Department of Commerce that has been delegated the responsibility to manage United States marine fisheries through fishery management plans, plan amendments, and regulations implementing those plans and plan amendments.  The National Marine Fisheries Service is the United States government agency with primary responsibility for managing marine fisheries.

## STATUTORY AND REGULATORY BACKGROUND

### I.    THE ADMINISTRATIVE PROCEDURE ACT

23.    The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  *Id.* § 704.

24.    In an APA suit, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be - (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

II.    **UNDER THE MAGNUSON-STEVENS ACT, FISHERIES ARE GOVERNED UNDER A TWO-TIERED SYSTEM IN WHICH REGIONAL COUNCILS ADVISE THE FISHERIES SERVICE**

25.    The Magnuson-Stevens Act established an elaborate system for conserving and managing fish populations found primarily in United States territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (three miles from shore in the Northeast United States) to 200 miles offshore or to an international boundary with neighboring countries.

26.    The Magnuson-Stevens Act created eight regional fishery management councils and charged them with preparing fishery management plans for all managed species.  Two of those regional councils, the New England Fishery Management Council and the Mid-Atlantic Fishery Management Council, have jurisdiction over the 13 federal fisheries in the Northeast United States.  16 U.S.C. § 1852(a)(1)(A)-(B).

27.    Councils are initially responsible for developing plans and plan amendments for each fishery "that requires conservation and management" within the councils' respective geographic areas of authority. *Id.* § 1852(h)(1).

28.    Councils must include in their FMPs or FMP amendments the measures necessary to conserve and manage particular species of fish.  *Id.* § 1853(a)(1)(A).

29.    After developing a plan or plan amendment, the council submits the rule to the Secretary of Commerce, who, acting through the Fisheries Service, evaluates the rule for consistency with the national standards set forth at 16 U.S.C. § 1851(a), the other provisions of the Magnuson-Stevens Act, and any other applicable law.  If the Secretary determines that the rule is consistent with all applicable law, the Secretary approves the rule.  Otherwise the Secretary may completely, or partially, disapprove the rule.  *Id.* § 1854(a).

30.    The Magnuson-Stevens Act sets deadlines for the Secretary to approve, disapprove, or partially approve amendments and promulgate implementing regulations. *Id.* § 1854(a), (b).

### III.    THE MAGNUSON-STEVENS ACT AND DEFENDANTS' OWN REGULATIONS REQUIRE THE FISHERIES SERVICE TO ESTABLISH A STANDARDIZED METHODOLOGY TO ASSESS THE AMOUNT AND TYPE OF BYCATCH IN EACH FISHERY

31.    The Magnuson-Stevens Act defines "bycatch" as "fish which are harvested in a fishery, but which are not sold or kept for personal use and includes economic and regulatory discards. . . ." 16 U.S.C. § 1802(2).

32.    When it amended the Magnuson-Stevens Act in 1996 to add new provisions requiring the Fisheries Service to monitor and minimize bycatch and bycatch mortality, Congress expressed its concern about the significant amount of bycatch and waste that occurs in the Nation's fisheries. In the words of one of the 1996 amendments' principal sponsors, Congress intended the 1996 amendments to "bring a stop to this inexcusable amount of waste." 142 Cong. Rec. S10810 (daily ed. September 18, 1996) (statement of Sen. Stevens).

33.    The 1996 amendments specifically required that each FMP "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." *Id.* § 1853(a)(11).

34.    After the passage of the 1996 amendments, the Fisheries Service prepared, pursuant to 16 U.S.C. § 1851(b), guidelines to assist regional fishery management councils in developing fishery management plans. On May 1, 1998, the Fisheries Service promulgated these guidelines as a final rule. 63 Fed. Reg. 24,212 (May 1, 1998).

35.    The guidelines state that bycatch may "impede efforts to protect marine ecosystems and achieve sustainable fisheries" by increasing the uncertainty as to the amount of

fish killed by fishing activity and by precluding "more productive uses of fishery resources."  50 C.F.R. § 600.350(2)(b).

36.    The guidelines further state that

"Councils must –

(1) *Promote development of a database on bycatch and bycatch mortality to the extent practicable.*  A review and, where necessary, improvement of data collection methods, data sources, and applications of data must be initiated for each fishery to determine the amount, type, disposition, and other characteristics of bycatch and bycatch mortality for purposes of this standard and of section 303(a)(11) [16 U.S.C. § 1853(a)(11)] and (12) of the Magnuson-Stevens Act.  Bycatch should be categorized to focus on management responses necessary to minimize bycatch and bycatch mortality to the extent practicable.  When appropriate, management measures, such as at-sea monitoring programs, should be developed to meet these information needs."

*Id.* § 600.350(d).

## IV.    NEPA REQUIRES FEDERAL AGENCIES TO EVALUATE THE ENVIRONMENTAL IMPACTS OF THEIR ACTIONS

37.    Before federal agencies such as the defendants take a major action significantly affecting the quality of the human environment, NEPA requires that the agencies prepare a detailed statement evaluating "the environmental impact of the proposed action."  42 U.S.C. § 4332(2)(C)(i).

38.    Council on Environmental Quality ("CEQ") and NOAA guidelines permit the Fisheries Service to develop an EA in order to determine whether it is necessary to develop a more detailed EIS.  40 C.F.R. § 1501.4; NOAA Administrative Order 216-6 § 5.03.

39.    In order to make that determination, the EA must evaluate the direct, indirect, and cumulative impacts of the proposed action.  40 C.F.R. § 1508.8 - .9; NOAA Administrative Order 216-6 § 5.03b.

40.    The terms "effects" and "impacts" are synonymous as used in NEPA regulations. *Id.* § 1508.8. "Effects" includes "[i]ndirect effects which . . . are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

41.    The term "cumulative impact" refers to "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7.

42.    CEQ regulations identify several factors to consider in determining whether an EIS is necessary, including "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "the degree to which the action may establish a precedent . . . or represents a decision in principle about a future consideration", "whether the action is related to other actions with individually insignificant but cumulatively significant impacts," and the likelihood that the decision may result in a violation of federal environmental laws. 40 C.F.R. § 1508.27(b).

43.    For purposes of determining whether to prepare an EIS, "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

44.    NOAA guidelines establish more specific guidance for determining whether an EIS is necessary, including whether the action jeopardizes the sustainability of a target or non-target species; whether the action may be reasonably expected to adversely affect endangered or threatened species; and whether the action may have substantial cumulative adverse effects. NOAA Administrative Order 216-6 § 6.02.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    **PRIOR COURT DECISIONS REQUIRED THE FISHERIES SERVICE TO ESTABLISH A STANDARDIZED BYCATCH REPORTING METHODOLOGY IN THE NORTHEAST MULTISPECIES (GROUNDFISH) FISHERY AND THE ATLANTIC SEA SCALLOP FISHERY**

45.    The District Court ruled in *Conservation Law Foundation v. Evans*, 209 F. Supp. 2d 1, 13 (D.D.C. 2001) that the Fisheries Service violated the Magnuson-Stevens Act and the APA by failing to conduct a review of its bycatch reporting methodology in the groundfish fishery and by failing to adopt new measures to report and assess bycatch in the groundfish fishery.

46.    After a rulemaking on remand, the Court once again considered the Groundfish Fishery Management Plan.  The Court ruled in *Oceana v. Evans*, ("*Oceana I*") 2005 WL 555416 *42 (D.D.C. March 9, 2005) that Amendment 13 to the Groundfish Fishery Management Plan failed to "establish" a standardized bycatch reporting methodology, because while it set forth a performance goal of 5% observer coverage, it left the actual level of observer coverage completely to the discretion of the agency.

47.    The Court held that "an FMP that merely suggests a hoped-for result, as opposed to establishing a particular standardized methodology, does not measure up to the statute's requirements." *Oceana I,* 2005 WL 555416, at *40 (internal quotation marks and citation omitted).

48.    In a parallel case, the Court found Amendment 10 to the Atlantic Sea Scallop Fishery Management Plan to be unlawful, because it too failed to "establish" a standardized bycatch reporting methodology, instead leaving the actual allocation of observers up to the Northeast Regional Administrator.  *Oceana v. Evans* ("*Oceana II*"), 384 F. Supp. 2d 203, 232 (D.D.C. 2005).

49.    The Court found that "[i]nstead of analyzing what type of program--whether a mandated level of coverage or some other mechanism--would succeed in producing the statistically reliable estimates of bycatch needed to better manage the fishery, the FMP essentially assigns this task to the Regional Administrator." *Id.* at 233-34 (footnote omitted).

50.    The *Oceana II* Court found that "rather than keying an expansion of [the pre-existing observer] program to some assessment of what levels were necessary to generate reliable estimates, it [Amendment 10] instead linked the number of additional observers to a funding mechanism without considering whether this program would be adequate." *Id.* at 232-33.

51.    As the *Oceana II* Court explained, "[t]hough the Regional Administrator's discretion may be guided by the goal of achieving an "appropriate" level of accuracy, the statute requires a methodology, not a goal. A methodology need not necessarily be detailed, but it must at the very least provide decision makers and the public with a program of what actually will be *done* to improve bycatch reporting, and why these measures will be sufficient based on the best available science." *Id.* at 234 (emphasis in original).

52.    In response to the remand orders in *Oceana I* and *Oceana II*, the Fisheries Service conducted a rulemaking to establish a standardized bycatch reporting methodology for all 13 Northeast United States federal fisheries, including the scallop and groundfish fisheries. Final Rule, Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment, 73 Fed. Reg. 4736, 4737 (Jan. 28, 2008).

53.    Notwithstanding the secretive nature of the Fisheries Service's decision making process for this rule, Oceana attempted to vigorously participate in the rulemaking, including submitting written comment letters.  Comments of Oceana Concerning the Northeast Region

Standardized Bycatch Reporting Methodology Omnibus Amendment, 72 Fed. Reg. 41047 (July 26, 2007) and Proposed Implementing Regulations, 72 Fed. Reg. 46588 (Aug. 21, 2007), Sept. 24, 2007; Comments of Oceana Concerning the Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment, June 4, 2007; Comments of Oceana Concerning the Omnibus Standardized Bycatch Reporting Methodology Fishery Management Plan Amendment for the New England and Mid-Atlantic Regions, Dec. 22, 2006.

## II.   THE NORTHEAST REGION STANDARDIZED BYCATCH REPORTING METHODOLOGY OMNIBUS AMENDMENT SET FORTH A METHODOLOGY THAT IS INCOMPLETE AND FLAWED

54.    The Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment made progress over prior fishery management plan amendments by, for the first time, adopting a "performance measure by which the effectiveness of the Northeast Region SBRM can be measured, tracked, and utilized to effectively allocate the appropriate number of observer sea days." *Id.*

55.    The SBRM's performance measure would require that "the data collected under the Northeast Region SBRM are sufficient to produce a coefficient of variation (CV) of the discard estimate of no more than 30 percent." *Id.* at 4738.

56.    The SBRM did not apply its performance standard to important bycatch species that are targeted in state fisheries, but are not targeted in the Northeast federal fisheries. For example, the SBRM failed to apply its performance standard to allocating at-sea observers to monitor bycatch of striped bass and shad. *Id.* at 4743; Oceana Sept. 24, 2007 Comment Letter at 10-11; Oceana Dec. 22, 2006, Comment Letter at 3.

57.    In addition, the Final Rule revealed that the SBRM failed to completely specify a methodology, because "[a]t sea fisheries observers will, *to the maximum extent possible and*

14

*subject to available resources*, be allocated and assigned to fishing vessels according to the procedures established through the amendment." 73 Fed. Reg. at 4737 (emphasis added).

58.     In particular, if the Fisheries Service determines that there are "external operational constraints [that] would prevent NMFS from fully implementing the required at-sea observer coverage levels," the Fisheries Service Northeast Regional Administrator is no longer bound to comply with the performance standard. *Id.* at 4738.

59.     Instead, the Regional Administrator, after consideration of a broad list of factors specified in the SBRM including "any other criteria" identified by the Fisheries Service, and in consultation with the regional councils and the Regional Science and Research Director, may choose any allocation of at-sea observer coverage levels that she deems appropriate. *Id.*

60.     Notwithstanding its concern for "available resources," the SBRM establishes the capability to require industry-funded observers in the future, without providing for industry funding to make up any shortfall in resources required to meet the performance standard. *Id.*

61.     The SBRM authorizes the regional councils to change, through "framework adjustments," every single feature of the methodology, including the fundamental "CV-based performance standard." *Id.*

62.      Notwithstanding the statutory goal of reporting the "amount and type of bycatch occurring in the fishery," the SBRM mandates reporting only the "*observed* catch and discards," but not the total amount of discards. *Compare* 16 U.S.C. § 1853(a)(11) *with* 73 Fed. Reg. at 4738.

63. An independent scientific review of the SBRM identified numerous technical flaws that rendered its allocation of at-sea observer coverage irrational.  Murdoch K. McAllister, *Review of the Northeast Standardized Bycatch Reporting Methodology* (Lenfest Ocean Program

Sept. 2007); Oceana Sept. 24, 2007, Comment Letter at 3-6 (highlight main points of McAllister review).

64.     The Fisheries Service did not adequately respond to the independent scientific review and did not correct the flaws pointed out by the review in the Final Rule.

65.     The Fisheries Service issued a Finding of No Significant Impact ("FONSI") for the SBRM, finding that the SBRM was merely a methodology that had no environmental impacts.

**FIRST CLAIM FOR RELIEF: THE SBRM IS INCONSISTENT WITH THE REQUIREMENTS OF THE MAGNUSON-STEVENS ACT, IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA**

66.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-65 in this First Claim for Relief.

67.     The Magnuson-Stevens Act requires that fishery management plans "establish" a standardized bycatch reporting methodology to report the amount and type of bycatch in the fishery.  16 U.S.C. § 1853(a)(11).

68.     The SBRM failed to establish a standardized bycatch reporting methodology to report the amount and type of bycatch in the fishery, because the SBRM does not apply its methodology, including its performance standard, to important non-target species that are targeted in state fisheries, such as striped bass and shad.

69.     The SBRM failed to establish a standardized bycatch reporting methodology because the SBRM does not require the Regional Administrator to comply with its performance standard for allocating at-sea observer coverage levels if the Fisheries Service determines that there are "operational constraints" that prevent full implementation of the methodology.

70.     The SBRM failed to establish a standardized bycatch reporting methodology because it provided for the modification of every feature of the methodology through framework

adjustment, including the fundamental 30% CV performance standard.

71.    The SBRM failed to establish a standardized bycatch reporting methodology because it failed to require the Fisheries Service to report the total amount and type of bycatch.

72.    Accordingly, by approving the SBRM, the Fisheries Service violated the Magnuson-Stevens Act and the APA.

## SECOND CLAIM FOR RELIEF: THE SBRM IS ARBITRARY AND CAPRICIOUS, IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA

73.    Plaintiff realleges and reincorporates by reference the allegations of paragraphs 1-72 in this Second Claim for Relief.

74.    The Fisheries Service failed to adequately respond to the comments of an independent scientific review or correct the many significant technical flaws identified in that review.

75.    Accordingly, by approving the SBRM, the Fisheries Service acted arbitrarily and capriciously, in violation of the Magnuson-Stevens Act and the APA.

## THIRD CLAIM FOR RELIEF: THE FONSI IS ARBITRARY AND CAPRICIOUS, IN VIOLATION OF NEPA AND THE APA

76.    Plaintiff realleges and reincorporates by reference the allegations of paragraphs 1-75 in this Third Claim for Relief.

77.    The SBRM will have far-ranging and fundamental indirect and cumulative impacts on the environment because the data collected pursuant to its methodology will form the scientific basis for major conservation and management decisions in all Northeast United States federal fisheries, including decisions concerning the total allowable catch.

78.    The SBRM EA and FONSI failed to consider the cumulative impacts that the SBRM would have together with subsequent management decisions that would rely on the data collected pursuant to the SBRM.  EA at 266 (failing to take a hard look at the role of data

17

collection as the basis for subsequent fishery management measures).

79.    The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the SBRM might reasonably be expected to jeopardize the sustainability of target or non-target species.  *Id.* at 262-63.

80.    The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the SBRM might reasonably be expected to adversely affect threatened or endangered species. *Id.* at 264.

81.    The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the effects of the SBRM are likely to be highly uncertain or involve unique or unknown risks.  *Id.* at 265.

82.    Accordingly, the FONSI is arbitrary and capricious, in violation of NEPA and the APA.

## PRAYERS FOR RELIEF

1.    Enter a declaratory judgment that the SBRM violated the Magnuson-Stevens Act and the APA and that the EA/FONSI violated NEPA and the APA.

2.    Remand the SBRM and the EA/FONSI to the Fisheries Service to develop a new SBRM and NEPA analysis that complies with the Court's order.

3.    Enter an order awarding Oceana its fees, expenses, and costs.

4.    Provide such other and further relief as the Court deems necessary, just, or proper.

DATED this 25th day of February, 2008.

Respectfully submitted,

Eric A. Bilsky
DC Bar No. 433612
OCEANA, INC.
2501 M Street, NW, Suite 300
Washington, DC 20037-1311

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| OCEANA, INC. *1100* | CARLOS M. GUTIERREZ, in his official capacity as Secretary of the U.S. Department of Commerce;<br>National Oceanic and Atmospheric Administration;<br>National Marine Fisheries Service |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Eric A. Bilsky
OCEANA, INC.
2501 M Street, NW, Suite 300
Washington, DC 20037-1311
202-833-3900

AT

Case: 1:08-cv-00318
Assigned To : Huvelle, Ellen S.
Assign. Date : 2/25/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

- ○ **A. Antitrust**
  - ☐ 410 Antitrust

- ○ **B. Personal Injury/Malpractice**
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☐ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - ☐ 345 Marine Product Liability
  - ☐ 350 Motor Vehicle
  - ☐ 355 Motor Vehicle Product Liability
  - ☐ 360 Other Personal Injury
  - ☐ 362 Medical Malpractice
  - ☐ 365 Product Liability
  - ☐ 368 Asbestos Product Liability

- ◉ **C. Administrative Agency Review**
  - ☐ 151 Medicare Act

  Social Security:
  - ☐ 861 HIA ((1395ff)
  - ☐ 862 Black Lung (923)
  - ☐ 863 DIWC/DIWW (405(g)
  - ☐ 864 SSID Title XVI
  - ☐ 865 RSI (405(g)

  Other Statutes
  - ☐ 891 Agricultural Acts
  - ☐ 892 Economic Stabilization Act
  - ☒ 893 Environmental Matters
  - ☐ 894 Energy Allocation Act
  - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ○ **D. Temporary Restraining Order/Preliminary Injunction**

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

## E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

(⊙) 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Please see attached sheet   16 U.S.C. § 1855 (f), 42 U.S.C. §§4321-4370c; 5 USC §706

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** [_____] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐   NO ☒ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  2/25/2007    SIGNATURE OF ATTORNEY OF RECORD  *Eric A. Bilsky*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.