**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **OCEANA, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08-318 (ESH)** |
| ) | |
| **GARY F. LOCKE,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Oceana, Inc. ("Oceana") has filed for summary judgment on its claim that

defendants Secretary of Commerce Gary F. Locke, the National Oceanic and Atmospheric

Administration, and the National Marine Fisheries Service ("NMFS") (collectively, "the

agency") violated the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C.

§§ 1801-1884; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f; and

the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, through the issuance of a final rule

regarding an amendment to the agency's standardized bycatch reporting methodology ("SBRM"

or "the SBRM Amendment") for the thirteen federal fisheries in the northeastern United States.

Exhibit 3 to plaintiff's summary judgment motion consists of a declaration and October 8, 2008

report from Dr. Murdoch McAllister.  Defendants have moved to strike plaintiff's motion for

summary judgment on the grounds that the materials comprising Exhibit 3 are not part of the

administrative record and therefore are not properly before the Court.  For the reasons set forth

below, the Court grants defendants' motion.

**BACKGROUND**

In June 2007, defendants prepared a final draft of the proposed SBRM amendment.  (*See*

Administrative Record ["AR"] 2346-2983.)[1]  The draft's Executive Summary explains that

"[g]enerally, an SBRM can be viewed as the combination of sampling design, data collection

procedures, and analyses used to estimate bycatch in multiple fisheries."  (AR 2351.)  The

primary sources of information about fishery discards are "at-sea fishery observers" (*i.e.*,

scientists who board commercial fishing vessels to observe and record discards occurring on the

trip), surveys of recreational fisheries, and reports from fishing vessel trips, which can be

supplemented with information from other sources.  (*Id.*; *see also* Pl.'s Mot. for Summ. J. ["Pl.'s

SJ Mot."] at 7.)  This information can be used to assess fishery stock and give scientific advice to

fishery managers.  (AR 2351.)

The SBRM was developed to "evaluat[e] the effectiveness of the allocation of fisheries

observer effort across multiple fisheries to monitor a large number of species."  (AR 2351.)  The

SBRM consists of seven principal components: mechanisms for collecting discard data;

techniques for analyzing that data in order to allocate discard observers; a performance standard,

known as a coefficient of variation ("CV"), for measuring the precision of the bycatch estimates;

and four means of reviewing and refining the SBRM's effectiveness.  (AR 2352, 2487 n.28.)

On September 24, 2007, the final day for public comment on both the proposed SBRM

amendment and the proposed implementing regulations, the Lenfest Ocean Program submitted a

---

[1] Plaintiff's present challenge to the SBRM arose out of two challenges to defendants'
approval of Amendments 10 and 13 to the agency's northeast region fishery management plans
("FMPs") and related regulations.  In *Oceana, Inc*., *v. Evans* ("*Oceana I*"), No. 04-CV-811, 2005
WL 555416 (D.D.C. Mar. 9, 2005), and *Oceana, Inc.*, *v. Evans* ("*Oceana II*"), 384 F. Supp. 2d
203 (D.D.C. 2005), this Court granted summary judgment for defendants on most of plaintiff's
claims.  However, the Court concluded that the FMPs did not establish an SBRM as required by
the MSA and remanded the matter to the agency for further action.  *See Oceana I*, 2005 WL
555416, at *43; *Oceana II*, 384 F. Supp. 2d at 256.

report by Dr. McAllister that "focused primarily on the problem of bias in the SBRM's sampling

design and statistical method."[2]  (Pl.'s SJ Mot. at 9; *see* AR 3120-61 ("2007 McAllister

Report").)  McAllister's report expressed "serious reservations about the apparent low degree of

scientific rigor in the determination of the SBRM."  (AR 3124.)  That same day, plaintiff

submitted similar comments and also included a copy of the McAllister report.  (AR 3186-3200

(Oceana Comments); *see also* AR 3188 & n.9.)

On October 18, 2007, Patricia Kurkul, the regional administrator of NMFS, received an

analysis by Dr. Nancy Thompson, head of the NMFS's New England Fisheries Science Center

("Science Center"), of the 2007 McAllister Report.  (*See generally* AR 3882-85.)  Dr. Thompson

concluded that although McAllister raised important issues, his criticisms did not "provide a

sufficient basis to disapprove the SBRM Amendment."  (AR 3882.)  Thompson also stated that

the Science Center would provide "a more detailed response" to the McAllister report "for

inclusion in the response to public comments in the preamble to the final rule."  (AR 3885.)

On October 22, 2007, the NMFS approved the SBRM amendment.  (AR 3916; *see also*

3239-3880 (final SBRM amendment).)  On December 20, Thompson presented Kurkul with her

further analysis of McAllister's concerns.  (*See* AR 3919-28.)  Thompson's analysis provided

"additional technical justification for the approaches" taken by the agency, summarized the

additional work conducted since the first analysis, and reached similar conclusions as before.

(AR 3919-20.)  Thompson observed that "[i]n addition to the methods described in the SBRM"

for measuring the potential biases in observer data, the agency's preferred "combined ratio"

method of estimating discards was "validated" by a working paper authored by Paul Rago (and

---

[2] The final SBRM amendment defines bias "as a *systematic* difference between the expected value of a statistical estimate and the quantity it estimates."  (AR 3383 (emphasis in original).)  Thus, bias is a measure of "accuracy," or the closeness of a measured value to the actual value, while the CV performance standard is a measure of "precision," or the amount of variability among observations.  (*See* AR 3382-83.)

others) that was presented for peer review at an October 2007 Groundfish Assessment Review

Meeting ("GARM").  (AR 3924-25; *see* AR 4713-49 (Rago paper).)  Thompson also noted that

the agency had conducted simulation studies which supported the SBRM's estimation methods,

and she singled out a working paper by Chris Legault that was also presented for peer review at

the GARM.  (AR 3925-26; *see* AR 4750-61 (Legault paper).)  The GARM committee

characterized Dr. Legault's paper as concluding that the agency's combined ratio estimator was

more "pragmatic" than the "direct estimator" advocated by McAllister, because McAllister's

method relied upon data that is often unknown and whose estimates are not as "reliable" as the

agency's preferred data estimates.  (AR 3926.)

On January 28, 2008, the agency issued the final rule implementing the SBRM

amendment.  *See* 73 Fed. Reg. 4,736 (Jan. 28, 2008) (codified at 50 C.F.R. pt. 648).  (*See also*

AR 3952-74 (final rule).)  The rule's preamble presented the agency's responses to a variety of

public comments, including the 2007 McAllister report.  (AR 3962-66.)  On February 25,

plaintiff initiated this lawsuit.  On October 8, McAllister issued a report to plaintiff's counsel that

reviewed the final SBRM rule, entitled "Follow-up review of the NMFS' Standardized Bycatch

Reporting Methodology: is something fundamentally wrong with the SBRM approach which is

likely to result in serious error?"  (*See* Pl.'s SJ Mot., Ex. 3 at 34-76 ("2008 McAllister Report").)

On January 5, 2009, plaintiff moved to compel the inclusion of certain documents (but

not the 2008 McAllister Report) in the administrative record.  *See generally Oceana, Inc. v.*

*Locke* ("*Oceana III*"), 634 F. Supp. 2d 49 (D.D.C. 2009) (affirming magistrate judge's denial of

plaintiff's motion to compel inclusion), *aff'g* No. 08-CV-318, 2009 WL 1491516 (D.D.C. May

28, 2009).  On September 25, plaintiff filed its summary judgment motion and several supporting

exhibits.  Exhibit 3 to that motion consisted of the 2008 McAllister Report, an eleven-page

declaration by McAllister, and his curriculum vitae (collectively, "the McAllister testimony").

(*See* Pl.'s SJ Mot., Ex. 3 at 1-11 ("McAllister Declaration").)  In a footnote, plaintiff's motion

argues that the Court may consider the McAllister testimony under *Esch v. Yeutter*, 876 F.2d 976

(D.C. Cir. 1989).  (*See* Pl.'s SJ Mot. at 12 n.6.)  In *Esch*, the D.C. Circuit observed the general

rule that "judicial review of agency action is normally to be confined to the administrative

record," but also observed that in eight situations, courts have departed from the general rule and

permitted the introduction of extra-record information.  876 F.2d at 991 & n.166.  Plaintiff

contends that the McAllister testimony falls under three of the eight situations described in *Esch*,

because (1) "it provides background information to help the court understand the complex issues

before it" relating to the precision of the agency's discard estimation methods; (2) "it addresses

relevant factors that the agency failed to consider" relating to statistical bias in the agency's

discard estimation methods; and (3) "it highlights environmental consequences and reasonable

alternatives neglected in the agency's [environmental assessment] . . . ."  (Pl.'s SJ Mot. at 12 n.6

(citing *Esch*, 876 F.2d at 991).)

On October 15, 2009, defendant moved to strike the McAllister testimony, arguing that

even if plaintiff's footnote were the proper vehicle for seeking its admission, (1) *Esch*'s

discussion of exceptions to the administrative record rule is not controlling law, and (2) even if it

were, plaintiff "'must first establish that the agency acted in bad faith or otherwise behaved

improperly, or that the record is so bare that it prevents effective judicial review.'"  (Defs.'s Mot.

to Strike at 5 (quoting *County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 79 (D.D.C.

2008)) (emphasis omitted).)  Plaintiff responds that *Esch* correctly describes the state of the law

in this Circuit, and that no showing is required before it may submit McAllister's testimony.  In

the alternative, plaintiff contends that the agency committed "procedural irregularities" in

promulgating the SBRM rule which constitute "bad faith or improper behavior" that would

justify admission of the testimony.  (*See* Pl.'s Opp'n to Mot. ["Pl.'s Opp'n"] at 10-11 (citing

*Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 199 (D.D.C. 2005).)

## ANALYSIS

### I.        APPLICABLE STANDARD

Judicial review of agency actions "is confined to the full administrative record before the

agency at the time the decision was made." *Camden County Council on Econ. Opportunity v.*

*U.S. Dep't of Health & Human Servs.*, 563 F. Supp. 2d 262, 265 (D.D.C. 2008) (citing *Envtl.*

*Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981)).  "When reviewing that record, the

Court considers 'whether the agency has considered the relevant factors and articulated a rational

connection between the facts found and the choice made.'"  *Id.* (quoting *Jifry v. FAA*, 370 F.3d

1174, 1180 (D.C. Cir. 2004)).

The parties dispute the legal principles governing the Court's potential consideration of

the McAllister testimony.  As recently explained by Chief Judge Lamberth in *The Cape Hatteras*

*Access Preservation Alliance v. U.S. Department of Interior*, some of that confusion is

attributable to the case law's discussion of "supplementing" an administrative record in two

analytically distinct situations.  *See* No. 09-CV-236, 2009 WL 3683120, at *2 (D.D.C. Nov. 4,

2009); *see also Pac. Shores Subdivision v. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C.

2006).  One situation involves a claim "that some information that should have properly been

included in the administrative record was not," while the other involves a request for judicial

consideration of evidence that exists apart from the administrative record, on the theory that if

the Court did not consider that evidence, "reviewing agency action would be unnecessarily

difficult."  *Cape Hatteras*, 2009 WL 3683120, at *2; *see also Pac. Shores*, 448 F. Supp. 2d at 6

(distinguishing "seek[ing] to *include* evidence in the record" from "moving the Court to review evidence *outside of* or *in addition to* the administrative record"). Plaintiff's submission of the McAllister testimony falls into the latter category of "extra-record" evidence, because those documents were not before the agency when it issued the final rule.

This Court has previously observed that *Esch*'s discussion of eight exceptions to the general rule regarding consideration of extra-record evidence was *dicta*. *See Oceana II*, 384 F. Supp. 2d at 218 n.17. Upon further consideration of Chief Judge Lamberth's opinion in *Cape Hatteras*, *see* 2009 WL 3683120, at \*3-\*4, this Court is persuaded that *Esch* should be read narrowly. This result is consistent with the D.C. Circuit's decision in *IMS, P.C. v. Alvarez*, which only identified four "accepted exceptions to the principle that the court cannot consider information that falls outside the agency record." 129 F.3d 618, 624 (D.C. Cir. 1997); *see Cape Hatteras*, 2009 WL 3683120, at \*4 (same). There, the Court of Appeals rejected the proposed submission of extra-record affidavits because the plaintiff had neither "made the 'strong showing of bad faith or improper behavior' required to justify" considering extra-record evidence, *IMS*, 129 F.3d at 624 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)), nor shown that "the agency failed 'to explain administrative action [so] as to frustrate effective judicial review'" by failing "to examine all relevant factors" or "to adequately explain its grounds for decision." *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)). Accordingly, the Court will only permit the submission of the McAllister testimony if plaintiff has shown that the agency (1) acted in bad faith in reaching its decision, (2) engaged in improper behavior in reaching its decision, (3) failed to examine all relevant factors, or (4) failed to adequately explain its grounds for decision. *See id.*

## II.      THE MCALLISTER TESTIMONY WILL BE STRICKEN

### A.      Plaintiff Has Not Demonstrated the Agency's Bad Faith or Improper Behavior.

As an initial matter, the Court is not persuaded by plaintiff's contention that defendants

engaged in "procedural irregularities" that constitute evidence of "bad faith or improper

behavior" sufficient to justify admission of the McAllister testimony.  (*See* Pl.'s Opp'n at 10.)

Plaintiff suggests that the agency's procedural decision not to prepare an Environmental

Impact Statement ("EIS") demonstrates defendants' bad faith.  (Pl.'s Opp'n at 10-11.)  The Court

rejects this argument.  While plaintiff is free to challenge the legal merits of that decision, the

mere fact of that decision, without any specific allegations of impropriety, does not show bad

faith.  *Cf. Fund for Animals*, 391 F. Supp. 2d at 198 (permitting supplementation of record where

plaintiffs made *prima facie* showing that agency knowingly excluded relevant and adverse

information from record).

Plaintiff also argues that the agency "chiefly relie[d]" upon the Rago and Legault

working papers, which were neither completed nor made public "until after the close of the

comment period and after the agency had made its final decision," thereby depriving Oceana of

an "opportunity to review or respond to these studies on the record."  (Pl.'s Opp'n at 10; *see also*

Pl.'s SJ Mot. at 29-30.)  The Court disagrees.  Based upon its review of the record, the Court

concludes that neither the SBRM amendment nor its implementing rule "chiefly rel[y]" on the

Rago and Legault papers.

First, the SBRM amendment does not cite either the Rago or Legault working paper.[3]

Nor could it have done so.  The agency approved the amendment on October 22, 2007, *before*

---

[3] Although the SBRM amendment frequently cites other research by Rago (and by one of the co-authors of his working paper), the specific papers presented at the October 2007 GARM are not cited.  (*See also* AR 3545-51 (references).)

those two papers were completed on October 24 and later presented for peer review at the

GARM.  (*See* Def.'s Notice of Filing Am. Supplement to Admin. R., Ex. 1 (Supplemental AR

Index) at 2 (listing October 24, 2007 date for both papers).)

Second, the agency's final rule, issued in January 2008, cites fourteen peer-reviewed

publications by name when responding to McAllister's concerns, but not the Rago or Legault

working papers, which are only discussed indirectly by reference to their consideration during

the October 2007 GARM.  (*See* AR 3962-66 & nn.1-15.)  Rago's findings are cited merely as

"another" way to validate the SBRM's methods, "[i]n addition to the methods described in the

SBRM" (AR 3965), and Legault's simulation study of six discard estimation methods is

referenced as one of *multiple* simulation studies.  (*See* AR 3965 ("[S]imulation tests of

alternative estimators have been conducted for several species. . . .  NMFS has *also* conducted

studies to estimate total landings from the observed sample data and have found good agreement

for the methods used in the SBRM." (emphasis added).)

Accordingly, the Court concludes that plaintiff has not made the "strong showing" of bad

faith or improper behavior required to justify admission of the McAllister testimony.

**B.      McAllister's Recent Criticisms of the Agency's Quantitative Analyses Are
         Inadmissible.**

**1.      "Background information" on "complex issues"**

Plaintiff argues that the McAllister testimony provides helpful background information

regarding complex quantitative issues relating to the precision of the agency's discard estimation

methods and the Rago and Legault papers.  The Court construes this argument as one that the

agency failed "to adequately explain its grounds for decision."  *IMS*, 129 F.3d at 624.

Nonetheless, plaintiff has not shown that the agency's rationale cannot be understood because of

the technical issues involved.  On the contrary, there are a number of instructive discussions in

the SBRM amendment, the 2007 McAllister Report, and the final SBRM rule itself.  If, at a later

date, the Court concludes that the record does not contain sufficient explanations, it may then be

appropriate for the Court to seek clarification from the agency, "'either through affidavits or

testimony, such additional explanations of the reasons for the agency decision as may prove

necessary.'"  *Envtl. Def. Fund*, 657 F.2d at 285 (quoting *Pitts*, 411 U.S. at 143).  However, these

"new materials should be merely explanatory of the original record and should contain no new

rationalizations" for the agency's decision.  *Id.*  "If the agency action, once explained by the

proper agency official, is not sustainable on the record itself, the proper judicial approach has

been to vacate the action and to remand the matter back to the agency for further consideration."

*Id.*

In the alternative, "[a]lthough the subject matter of this case does have a highly technical

aspect," the McAllister testimony is not "primarily explanatory in nature."  *Corel Corp. v. United

States*, 165 F. Supp. 2d 12, 31 (D.D.C. 2001).  It is primarily "argumentative," and thus

inappropriate for the Court to consider.  *Id.*  The title of McAllister's 2008 report "quite

accurately encapsulates the purpose and nature of his submissions," *id.*, since it asks: "[I]s

something *fundamentally wrong with the SBRM approach* which is likely to result in serious

error?"  (2008 McAllister Report at 1 (italics added).)  The report itself "attack[s] the merits" of

the agency's analytical choices and conclusions and then "conduct[s] [its] own . . . analysis,"

from which McAllister concludes that the agency should have chosen different inputs when

developing the SBRM.  *Corel*, 165 F. Supp. 2d at 31.  (*See, e.g.*, 2008 McAllister Report at 12

("The NMFS' replies were examined, classified according to the specific points in the [2007

McAllister Report] that they address and are summarized below.  *We evaluate their substance* in

the context of the SBRM and of the terms of reference provided by Oceana." (emphasis

added)).)[4]

The mere fact that McAllister disputes the agency's responses to his initial comments and "reiterate[s] scientific criticisms" already in the record (Pl.'s Opp'n at 3) does not transform the reasons for his disagreement into relevant "background information."  Nor is this Court's prior opinion in *Oceana II* to the contrary.  (*See id.* at 12.)  There, the Court denied a motion to strike plaintiff's submission of a post-decisional extra-record letter by a scientist who was one of the "original developers" of the analytical model used by the agency in its challenged action and who criticized the agency's reliance upon her work.  384 F. Supp. 2d at 217-18 & n.17.  Where a scientist challenges the manner in which an agency has relied upon her own research, her unique familiarity with the meaning of that research can constitute "particularly relevant" background information about the basis for the agency's decision.  *See id.* (internal quotation marks omitted); *cf. Carlton v. Babbitt*, 26 F. Supp. 2d 102, 108, 111 (D.D.C. 1998) (ruling that agency should have considered scientist's declaration, which was submitted prior to agency's decision, because agency ultimately relied solely upon that scientist's research article for certain conclusions, yet his declaration "explicitly disclaim[ed] the [agency's] optimistic reading of his article," making "his understanding of his own article . . . particularly relevant").  But that is not the case here; McAllister's testimony about the agency's discard estimation method is "offered primarily to

---

[4] Similarly, the McAllister Declaration asserts (1) that notwithstanding Thompson's conclusion that the agency's combined ratio discard estimation method was validated through a comparison of certain datasets from the Rago paper (*see* AR 3924-25), McAllister's own comparison of different datasets from the Rago paper "refute[s] the NMFS' conclusion that the technique exhibited little evidence of bias"; (2) that it was "inappropriate" for the agency to claim that the Legault paper "shows no bias" in the agency's preferred discard estimation method, because McAllister's own review of the underlying datasets "suggest[s]" that the agency's method "would perform poorly" when applied to certain species; and (3) that McAllister's own review of the data shows that the agency's choice of a 30 percent CV performance standard "is not very precise" when applied to certain species.  (McAllister Decl. ¶¶ 14-15, 19, 20.)

attack the propriety of the challenged agency action, [and therefore, it] will be stricken." *Corel*,

165 F. Supp. 2d at 32.

### 2.      Agency's failure to consider "relevant factors"

Plaintiff suggests that the McAllister testimony "addresses relevant factors that the

agency failed to consider" relating to the accuracy of the agency's discard estimation methods.

(Pl.'s SJ Mot. at 12 n.6.)  Specifically, McAllister asserts that the agency failed to consider how

systematic biases in discard estimates and their variance could significantly skew the number and

allocation of bycatch observers that the agency deems necessary to achieve its chosen 30 percent

CV measure of performance.  (McAllister Decl. ¶ 23.)  However, bias is hardly a "factor not

considered" by the agency.  (*Id.*)  To the contrary, Chapter 5 of the draft SBRM amendment,

entitled "Sampling Design and Estimation of Precision and Accuracy" (*see* AR 3381-3436),

thoroughly discusses issues of bias.  (*See, e.g.*, AR 3383 (citing "non-representative sampling"

and "statistical properties of the consistency of the estimators" as "two primary potential sources

of bias in a sampling program such as the at-sea observer program"); AR 3411 ("Several

analytical tests were conducted to evaluate the potential sources of bias in the 2004 observer

data.").)  McAllister's chief criticism actually appears to be that the agency concluded "that

neither the data nor the statistical estimators showed significant bias . . . ."  (2008 McAllister

Report at 25.)  He argues that the evidence which the agency invoked "to support the hypothesis

of no bias" was "far from . . . conclusive" and "could actually be used to reject that same

hypothesis."  (*Id.*)  Thus, McAllister's testimony as to bias "does not add factors that [the

agency] failed to consider as much as it questions the manner in which [the agency] went about

considering the factors it did."  *Corel*, 165 F. Supp. 2d at 31-32.

Plaintiff also argues that the McAllister testimony should be considered because it

purportedly raises issues that the agency "neglected" during its NEPA analysis (Pl.'s SJ Mot. at

12 n.6), which the Court will construe as a claim that the agency failed "to examine all relevant

factors."  *IMS*, 129 F.3d at 624.[5]  Specifically, plaintiff claims that the agency failed to account

for "cumulative impacts" of the SBRM amendment "related to bias and error over time . . . ."

(Pl.'s Opp'n at 16; *see also* Pl.'s SJ Mot. at 31.)  "Cumulative impact" is one of the factors to be

considered in determining whether a proposed action will significantly affect the environment

and is defined as "the impact on the environment which results from the incremental impact of

the action when added to other past, present, and *reasonably foreseeable* future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40

C.F.R. § 1508.7 (emphasis added).  The McAllister Declaration contends that the SBRM's 30

percent CV performance standard is too imprecise to accurately detect changes in discard levels,

and that this imprecision could prevent the agency from adequately managing discards over time.

(McAllister Decl. ¶¶ 27-29.)

Plaintiff mischaracterizes the agency's treatment of the cumulative impact issue.  The

final SBRM rule notes that Section 7.3 of the SBRM amendment "explicitly provides a

discussion of the expected cumulative effects associated with the action."  (AR 3960.)  Section

7.3 explains that the SBRM amendment is an administrative measure focusing on processes for

collecting and analyzing existing levels of bycatch, and that the establishment of an SBRM

---

[5] It is arguable that the D.C. Circuit's opinion in *Izaak Walton League of America v. Marsh* provides a separate legal basis for considering extra-record evidence where, as here, a plaintiff challenges an environmental assessment under NEPA, because "[s]uits challenging environmental impact statements seek to ensure compliance with a statute other than the APA." 655 F.2d 346, 369 n.56 (D.C. Cir. 1981).  However, as a practical matter, the analysis under *Izaak Walton League* is essentially the same as the *IMS* "relevant factors" analysis.  *See id.* ("The reviewing court must ensure that the agency decision adequately discusses environmental effects and alternatives.  Allegations that an impact statement fails to consider serious environmental consequences or realistic alternatives raise issues sufficiently important to warrant introduction of new evidence in the District Court.").

performance standard was a change from the status quo, which lacked such a standard.  (AR

3514.)  The agency concluded that because the performance standard was a "purely

administrative feature[]," it would not presently affect the environment any differently than the

status quo's baseline.  (AR 3514-15.)  Nor would the "CV-based performance standard," *on its*

*own*, have any cumulative impact over time, because the SBRM amendment would not

implement any changes to fishing operations.  (*See* AR 3515.)  Such operational changes would

only be implemented if the SBRM yielded evidence that discard levels were too high and the

agency subsequently took "a new management action" to reduce bycatch.  (AR 3516.)  The

agency observed that such a management action was not "reasonably foreseeable," and that it

was therefore "not practicable to conduct a NEPA analysis on these potential impacts at this

time."  (*Id.*)  *See also Izaak Walton League*, 655 F.2d at 377 ("NEPA does not require federal

agencies to examine every possible environmental consequence.  Detailed analysis is required

only where impacts are likely.").

The agency considered the issue of cumulative impact and concluded that no cumulative

impact was posed by the SBRM amendment and its performance standard.  McAllister's attack

upon the supposedly insufficient precision of the 30 percent CV merely re-argues plaintiff's

original criticism that "the less precise the methodology, the greater the risk to the environment."

(AR 3198 (Oceana Comments).)  Thus, the testimony does not offer "proof of an environmental

factor inappropriately excluded from consideration by the assessing agency."  *The Humane Soc.*

*of U.S. v. Dep't of Commerce*, 432 F. Supp. 2d 4, 15 (D.D.C. 2006).[6]

---

[6] The Court's analysis is equally applicable to plaintiff's claim that the McAllister
testimony should be considered because it pertains to whether defendants violated NEPA.  (*See*
Opp'n at 17-19.)  Plaintiff's citation to this Court's prior opinion in *Humane Society* is
inapposite.  (*See id.* at 18.)  In that case, the Court considered extra-record evidence which
suggested that the agency reversed its earlier position that an EIS was not required.  *See* 432 F.
Supp. 2d at 15.  Unlike that situation, McAllister's testimony does not have a "direct bearing on

## CONCLUSION

For the aforementioned reasons, the Court grants defendants' motion to strike [Dkt. 36]

plaintiff's motion for summary judgment.  Plaintiff may re-file its motion for summary judgment

on or before December 15, 2009, but it may not include the 2008 McAllister Report or the

McAllister Declaration.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:   November 25, 2009

---

the correctness" of the agency's conclusion that the SBRM (and its 30 percent CV performance
standard) would have no cumulative impact.  *Id.*  Therefore, his testimony is not "directly
relevant to a determination of whether an EIS is required in this case."  *Id.*