# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**OCEANA, INC.,**                                   )
                                                    )
      **Plaintiff,**                          )
                                                    )
      **v.**                                 )  **Civil Action No. 08-318 (ESH)**
                                                    )
**GARY F. LOCKE** *et al.*,                         )
                                                    )
      **Defendants.**                        )
_____)

## MEMORANDUM OPINION

Oceana, Inc. has sued Gary F. Locke,[1] in his official capacity as Secretary of the United

States Department of Commerce; the National Oceanic and Atmospheric Administration

("NOAA"); and the National Marine Fisheries Service ("NMFS")[2] (collectively "the agency")

for declaratory and injunctive relief related to the Secretary's approval of the methodology

established to assess the amount and type of bycatch (*i.e.*, fish that are harvested in a fishery but

not sold or kept for personal use) for the thirteen federal fisheries in the Northeast region.

Specifically, plaintiff contends that the standardized bycatch reporting methodology ("SBRM")

developed by defendants violates the Magnuson-Stevens Fishery Conservation and Management

Act ("MSA"), 16 U.S.C. §§ 1801-1891d, because it: 1) grants Regional Administrators

discretion to avoid implementing the SBRM upon a finding that there are operational constraints

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor. Accordingly, the Court substitutes Gary F. Locke for Carlos M. Gutierrez.

[2] Both NOAA and NMFS are agencies of the Department of Commerce. (Compl. ¶¶ 23-24.) NOAA has supervisory responsibility for NMFS, which has been delegated the primary responsibility for managing United States marine fisheries through fishery management plans, plan amendments, and regulations implementing those plans. (*Id.*)

that prevent its full execution; and 2) applies only to those species targeted by federal fisheries and excludes other species that are part of the bycatch. (Mot. of Pl. Oceana for Summ. J. ["Pl.'s Mot."] at 18.) Plaintiff further alleges that the agency's decision to approve the SBRM was arbitrary and capricious because the agency failed to adequately respond to scientific evidence and it ignored its own findings regarding issues of observer bias and precision. (*Id.* at 25.) Finally, plaintiff contends that the agency's decision to conduct an Environmental Assessment ("EA") as to the SBRM, which resulted in the issuance of a Finding of No Significant Impact ("FONSI"), rather than an Environmental Impact Statement ("EIS"), violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h. (*Id.* at 34.) Accordingly, plaintiff asks the Court to 1) declare the SBRM and the EA/FONSI in violation of the MSA, NEPA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; 2) remand the SBRM and the EA/FONSI to NMFS to develop a new SBRM and NEPA analysis that complies with the Court's order; and 3) award fees, expenses, and costs.

Before the Court are the parties' cross-motions for summary judgment. Having considered the voluminous administrative record, the parties' briefs, and the applicable case law, the Court will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment.

## BACKGROUND

## I.    STATUTORY FRAMEWORK

### A.    The Magnuson-Stevens Fishery Conservation and Management Act

The MSA, passed in 1976, "provides the statutory framework for the protection and management of the nation's marine fishery resources." *Conservation Law Found. v. Evans*, 209

F. Supp. 2d 1, 5 (D.D.C. 2001) ("*CLF*"); *see also* 16 U.S.C. § 1801(b). The Act created eight

Regional Fishery Management Councils[3] with "the authority and responsibility to govern

conservation and management of the fisheries under its geographical jurisdiction."[4] *CLF*, 209 F.

Supp. 2d at 5. The Regional Councils are tasked with developing and implementing Fishery

Management Plans ("FMPs") and amendments thereto. *Id.*; 16 U.S.C. § 1852(g)(3)(A). Each

FMP and FMP amendment is then recommended to and reviewed and evaluated by NMFS

and/or NOAA to determine whether it complies with the MSA[5] and other applicable law.[6] 16

U.S.C. § 1854. FMPs, FMP amendments, and any necessary implementing regulations are

subject to public review and comment. *Id.* § 1854(a)(1), (b)(1). If the Secretary finds that the

plan complies with all applicable law, he or she may approve it or partially or completely

disapprove it, *id.* § 1854(a), and, to the extent it is approved, the FMP or FMP amendment is

then implemented and enforced by NMFS. *Id.* § 1854(c).

---

[3] Regional Councils are "quasi-legislative bodies" (Defs.' Mot. for Summ. J. & Mem. in Opp'n to Pl.'s Mot. for Summ. J. ["Defs.' Opp'n"] at 4) made up of "individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned." 16 U.S.C. § 1852(b)(2)(A). The eight councils are: the New England Council; the Mid-Atlantic Council; the South Atlantic Council; the Caribbean Council; the Gulf Council; the Pacific Council; the North Pacific Council; and the Western Pacific Council. *Id.* § 1852(a)(1)(A)-(H).

[4] Two of the Regional Councils, the New England Council and the Mid-Atlantic Council, have jurisdiction over the thirteen federal fisheries in the Northeast United States. (Compl. ¶ 28); *see also* 16 U.S.C. § 1852(a)(1)(A)-(B).

[5] The MSA sets forth fifteen "National Standards," or requirements, for FMPs, 16 U.S.C. § 1853(a)(1)-(15), and the Secretary may not adopt an FMP recommended by a Regional Council if it violates any of these provisions. *See CLF*, 209 F. Supp. 2d at 5-6. At issue in this case is provision 11, which requires the establishment of an SBRM for each FMP. 16 U.S.C. § 1853(a)(11).

[6] The approval of an FMP requires: (1) an initial review of the FMP, to ensure its consistency with the MSA and other applicable law; (2) the publishing of the FMP in the Federal Register, followed by a 60-day public comment period; and (3) the approval, disapproval, or partial approval of the FMP within 30 days of the end of the comment period. 16 U.S.C. § 1854(a); *see also CLF*, 209 F. Supp. 2d at 5.

In 1996, Congress passed the Sustainable Fisheries Act ("SFA"), which amended the MSA to require that all FMPs include a standardized reporting methodology "to assess the amount and type of bycatch occurring in the fisher[ies]," as well as conservation and management measures that minimize bycatch and the mortality of bycatch which cannot be avoided.[7]  16 U.S.C. § 1853(a)(11); Pub. L. No. 104-297 § 108(b), 110 Stat. 3559, 3574-75 (Oct. 11, 1996).[8]  Following passage of the SFA, NMFS prepared guidelines, ultimately adopted as a final rule, to assist Regional Councils in the development of FMPs.  63 Fed. Reg. 24,212 (May 1, 1998), *codified in relevant part at* 50 C.F.R. § 600.350.  The guidelines state that "[a] review and, where necessary, improvement of data collection methods, data sources, and applications of data must be initiated for each fishery to determine . . . bycatch and bycatch mortality . . . ."  50 C.F.R. § 600.350(d)(1).

### B.  National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321-4370f, "has twin aims" of "'plac[ing] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action'" and "ensur[ing] that the agency will inform the public that it has indeed considered

---

[7] The MSA provision relevant to SBRMs states:

> [a]ny fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall . . . establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority[:] (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided.

16 U.S.C. § 1853(a)(11).

[8] Congress further amended the MSA when it passed the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006.  Pub. L. No. 109-479, 120 Stat. 3575 (2007).  The 2006 act mandated the use of catch limits and other accountability measures targeting overfishing.  *See* 16 U.S.C. § 1853(a)(14)-(15).

environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 553 (1978)).  The Act "d[oes] not require agencies to elevate environmental concerns over other appropriate considerations," but rather, it requires agencies to "take a 'hard look' at the environmental consequences before taking a major action." *Id.*; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989) (holding NEPA does not impose "substantive environmental obligations" on agencies, but rather "prohibits uninformed—rather than unwise—agency action").

## II.    PRIOR LITIGATION

This case arises from two earlier challenges by plaintiff to the agency's approval of FMPs in the Northeast.  In 2005, plaintiff filed parallel lawsuits, challenging Amendment 13 to the Northeast Multispecies FMP, *Oceana, Inc. v. Evans*, No. 04-811, 2005 WL 555416 (D.D.C. Mar. 9, 2005) ("*Oceana I*"),[9] and Amendment 10 to the Atlantic Sea Scallop FMP, *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005) ("*Oceana II*").  In both cases, this Court granted summary judgment to defendants on most of plaintiff's claims.  However, in *Oceana I*, plaintiff argued, *inter alia*, that Amendment 13 did not establish an SBRM, despite endorsing an *intended* level of bycatch oversight, because it failed to establish a mandatory level of oversight.  2005 WL 555416, at *39.  The Court agreed, noting that the Amendment "d[id] not contain a

---

[9] In a precursor to plaintiff's 2005 challenges, Judge Kessler of this Court found in 2001 that an FMP amendment and "framework adjustment" setting forth certain bycatch reporting provisions were insufficient to satisfy the requirements of the MSA.  *CLF*, 209 F. Supp. 2d at 11-13.  The Court entered a remedial order setting a minimum level of observer coverage.  *Id.* at 13; *see also Oceana I*, 2005 WL 555416, at *37.  NMFS subsequently promulgated Amendment 13, which was the subject of plaintiff's challenge in *Oceana I*.  (Defs.' Opp'n at 9); *see also Oceana I*, 2005 WL 555416, at *38-39.

mandatory level of observer coverage"[10] and "d[id] not contain any new bycatch reporting methodology." *Id.* The Court further held that although the SBRM set forth the agency's intention to achieve a five-percent level of observer coverage, "an FMP that merely suggests a hoped-for result, as opposed to 'establish[ing]' a particular standardized methodology, does not measure up to [MSA's] requirements." *Id.* at *40 (quoting 16 U.S.C. § 1853(a)(11) (alteration in original)). Specifically, the Court found that the "desire" of the agency to maintain a minimum level of coverage was "ambiguous" and "optional" because the Amendment provided that the coverage level "may be subject to change if the Secretary deems it proper." *Id.* at *39. Further, the Court held that the agency's failure to respond to the Babcock Study commissioned by Oceana regarding the precision of discard estimates constituted disregard of the "best scientific information available" in violation of the MSA and the APA. *Id.* at *42; *see also* 16 U.S.C. § 1851(a)(2) ("[c]onservation and management measures shall be based upon the best scientific information available").

Similarly, in *Oceana II*, the Court held that Amendment 10 violated the MSA because it "d[id] not set forth the substance of a reporting methodology for the scallop fishery except in a vague and conclusory fashion" that gave the NMFS Regional Administrator "complete discretion" regarding the implementation of bycatch reporting methods and standards. 384 F. Supp. 2d at 232, 234; *see also id.* at 234 n.41 (criticizing amendment for leaving "all decisions" regarding "method for determining observer concentration" to Regional Administrator). The Court found that the Amendment did not establish any techniques or levels of accuracy and did

---

[10] At-sea fishery observers (*i.e.*, scientists who board commercial fishing vessels to observe and record discards occurring on the trip) are an important source of information about fishery bycatch. *See Oceana, Inc. v. Locke*, 674 F. Supp. 2d 39, 42 (D.D.C. 2009). In developing an SBRM, one "key issue" is "how to allocate a limited number of observers on fishing vessels to obtain statistically reliable data that estimates, as accurately as possible, the amount of bycatch that occurs across the entire fleet." (Defs.' Opp'n at 1.)

not "target[] a specific level of observer coverage by area that would produce statistically reliable estimates of bycatch." *Id.* at 233. The Court also found that the agency, by remaining silent on the issue, again failed to demonstrate that it had responded adequately to the "best scientific information available" regarding bias and accuracy. *Id.* at 232. In both cases, the Court remanded the bycatch portions of the two amendments to the agency for further action. *Id.* at 256; *Oceana I*, 2005 WL 555416, at *43.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

After the issuance of *Oceana I* and *II*, NMFS set out to address the problems identified in those decisions by establishing a comprehensive Northeast SBRM that would set bycatch reporting and assessment standards for all thirteen federal fisheries in the Northeast region. *See* 73 Fed. Reg. 4,736, 4,737 (Jan. 28, 2008) (codified at 50 C.F.R. pt. 648) (noting that NMFS undertook to "address all Northeast Region FMPs" and that amendment "covers 13 FMPs, 39 managed species, and 14 types of fishing gear"). The Northeast Region Omnibus SBRM Amendment ("SBRM Amendment") established an SBRM comprised of seven elements, including: 1) bycatch reporting and monitoring mechanisms; 2) analytical techniques and allocation of at-sea fisheries observers; 3) a SBRM performance standard; 4) a SBRM review and reporting process; 5) framework adjustments and/or annual specification provisions; 6) a prioritization process to be used when mandated observer coverage levels cannot be implemented because of practical considerations such as budget constraints; and 7) provisions for industry-funded and observer set-aside programs. (Administrative Record ["AR] 3953-54.)

The final SBRM Amendment is a 642-page document that extensively discusses each of the above elements. (*See* AR 3239-80.) The Amendment was developed and finalized over a two-year period using a process, provided for in the MSA, by which Regional Councils create

and approve an amendment, and they then pass it on for review and approval by NMFS. *See* 16 U.S.C. § 1852(h)(5) (for fisheries under its authority, Regional Council shall prepare and submit FMPs and amendments to NMFS). Here, the SBRM Amendment was approved by the Mid-Atlantic Council (AR 3027-29) and the New England Council in June 2007. (AR 3058.) NMFS then made the SBRM Amendment available for public comment for a two-month period in July 2007. (AR 3076-77.) During that two-month period, NMFS also issued a proposed rule in August to implement the SBRM Amendment and opened it for public comment until September 24, 2007. (AR 3085, 3111.) Plaintiff submitted comments on both the draft Amendment and the proposed implementation rule.[11] (AR 3186-200.) The Lenfest Ocean Program also submitted comments on the Amendment and the proposed rule, which consisted primarily of a report from Dr. Murdoch K. McAllister entitled "Review of the Northeast Region Standardized Bycatch Reporting Methodology" ("McAllister Report").[12] (AR 3120-61.) Plaintiff's comments also referenced the McAllister Report and highlighted certain issues raised therein. (AR 3188-91.)

On October 18, 2007, the Science and Research Director of the New England Fisheries Science Center ("NEFSC"), a part of NMFS, prepared an analysis of and response to the McAllister Report for NMFS Regional Administrator Patricia Kurkul. (AR 3882-85.) The NEFSC response to the McAllister Report specifically addressed Dr. McAllister's concerns as to

---

[11] Plaintiff also participated in public meetings and submitted a series of comment letters throughout the two-year development and approval process. (Pl.'s Mot. at 4; *see also* AR 235, 380, 641, 3019.) In particular, plaintiff raised its concerns about observer-effect bias and the need for a full EIS and studies to determine the level of precision and accuracy needed in data. (Pl.'s Mot. at 4; *see also* AR 236, 237-38.)

[12] The McAllister Report sought to provide an "independent scientific review of the SBRM." (AR 3122.) The Report addressed, *inter alia*, whether the SBRM would achieve bycatch estimates with the expected precision, account for rare bycatch events, and consider the change in fishing behavior caused by the presence of observers (*i.e.*, the "observer effect"). (*Id.* 3122-23.) The Report specifically noted the problem of bias in discard estimates obtained from observed ships. (*Id.* 3126.)

the agency's selection of a "combined ratio method" as the bycatch estimator and the problem of potential bias in data derived from at-sea observer coverage versus fishing vessel trip reports ("FTVR"). (*Id.* 3882, 3883-84.) NEFSC "disagree[d]" that bias precluded the use of observer data based on its "extensive experience" with those data sets, noting that vessels would avoid fishing in a non-representative fashion because it could result in significant economic hardships for them. (*Id.* 3884.) Although NEFSC acknowledged that the measures of accuracy of observational data are incomplete, because the "truth" remains unknown, it found that any potential bias in the data did not undermine the overall program. (*Id.*) In short, although "[t]he McAllister report provide[d] a number of instances where further research can be directed," NEFSC concluded that "it d[id] not alter [its] conclusion that the SBRM is a scientifically-sound process for implementing a continuously improving process of bycatch estimation." (*Id.* 3885.) NEFSC also indicated that it would "provide a more detailed response to the comments and issues raised by Dr. McAllister for inclusion in the response to public comments in the preamble to the final rule." (*Id.*)

On October 22, 2007, Ms. Kukul sent a letter to the New England and Mid-Atlantic Councils, informing them that NMFS had approved the SBRM Amendment. (AR 3916.) On December 20, 2007, NEFSC provided a further response to the McAllister Report to Ms. Kukul for inclusion in the response to the public comments section of the final rule. (AR 3919-28; Defs.' Opp'n at 12.) NMFS promulgated the final rule implementing the SBRM Amendment on January 28, 2008. 73 Fed. Reg. 4,736 (Jan. 28, 2008). Plaintiff filed the instant action on February 25, 2008.

<u>**ANALYSIS**</u>

**I.      STANDARD OF REVIEW**

The appropriate standard of review of final agency decisions under the MSA is contained

in the APA.  NMFS final decision must be upheld unless it is found to be arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.  16 U.S.C. § 1855(f)(1)(B)

(reviewing court may set aside challenged regulation or action based only on grounds specified

in 16 U.S.C. § 706(2)(A)-(D)).  "The scope of review under the 'arbitrary and capricious'

standard is narrow and a court is not to substitute its judgment for that of the agency." *Arent v.*

*Shalala*, 70 F.3d 610, 616 (D.C. Cir. 1995).  "Administrative actions are presumed valid and are

accorded greater deference; thus, the inquiry is only whether the Secretary's decisions were

unreasonable, and 'this court will not second guess an agency decision or question whether the

decision made was the best one.'"  *Oceana II*, 384 F. Supp. 2d at 211-12 (quoting *C&W Fish Co.*

*v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991)).  The Court's only task is to "determine whether

the [agency] has considered the relevant factors and articulated a rational connection between the

facts found and the choice made." *Balt. Gas & Elec. Co.*, 462 U.S. at 105.

"Moreover, the Court will not lightly depart from regulations promulgated by an agency

in order to achieve a statute's goals." *Oceana II*, 384 F. Supp. 2d at 212 (citing *Continental Air*

*Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451-52 (D.C. Cir. 1988) ("It therefore will not

do, when interpreting a statute embodying conflicting demands, for courts grandly to resort to a

single 'broad purpose' of a statute and then employ a judicially idealized 'goal' to drive the

interpretive process.")).  Because enforcement of the MSA involves the interpretation and

evaluation of highly technical scientific findings, it is "especially appropriate for the Court to

defer to the expertise and experience of those individuals and entities-the Secretary, the

Councils, and their advisors-whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990); *see also Pittston Coal Group v. Sebben*, 488 U.S. 105, 150 (1988) ("[A]s an interpretive question becomes more technical, the expertise of the agency charged with a statute's administration becomes greater and deferring to its construction rather than importing our own becomes more appropriate.")

Similarly, under NEPA, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co.*, 462 U.S. at 97-98; *see also Nevada v. Dep't of Energy*, 457 F.3d 78, 87-88 (D.C. Cir. 2006) (applying APA's arbitrary and capricious standard "to review both the agency's procedural compliance with NEPA and the adequacy of an EIS"). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227-28 (1980) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) ("Neither [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.")).

## II.     SUFFICIENCY OF THE SBRM AMENDMENT UNDER THE MSA

The MSA requires NMFS to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." 16 U.S.C. § 1853(a)(11). Oceana

argues that the SBRM Amendment fails to establish such a methodology because it creates a "loophole" that allows the NMFS Regional Administrator to avoid applying the minimum acceptable level of observer coverage under the SBRM in any year "in which external operational constraints would prevent NMFS from fully implementing the required at-sea observer coverage levels," but instead to consult with Regional Councils as to the appropriate allocation of resources. (AR 3274-75; Pl.'s Mot. at 19-22.) Oceana further contends that the SBRM Amendment violates the MSA because the performance standard established in the Amendment does not apply to species that are not federally managed, although these species constitute a part of the fishery bycatch. (Pl.'s Mot. at 22-25.)

## A. The SBRM Amendment's Prioritization Process

As noted, the MSA requires NMFS to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that . . . minimize bycatch [and] minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11). In an effort to fulfill this requirement after *Oceana I* and *II*, the SBRM Amendment establishes a 30 percent CV performance standard.[13] (AR 3273; Defs.' Opp'n at 23.) The standard means that "[e]ach year, the Regional

---

[13] "CV" stands for "coefficient of variation." (AR 3884.) The SBRM defines "CV" as

> a standard measure of precision, calculated as the ratio of the square root of the variance of the bycatch estimate (i.e., the standard error) to the bycatch estimate itself. The higher the CV, the larger the standard error is relative to the estimate. A lower CV reflects a smaller standard error relative to the estimate. A 0-percent CV means there is no variance in the sampling distribution. Alternatively, CVs of 100 percent or higher indicate that there is considerable variance in the estimate.

(*Id.*)

Administrator and the Science and Research Director shall allocate sufficient at-sea observer coverage to the applicable fisheries of the Northeast Region in order to achieve a level of precision (measured as the CV) no greater than 30 percent for each applicable species and/or species group." (AR 3273.) The SBRM Amendment sets forth a detailed methodology by which the Regional Administrator can estimate the number of observer days needed to achieve the 30 percent standard and allocate observers among vessels to reach that benchmark. (Pl.'s Mot. at 20; AR 3429-34, 3444-57, 3465-66, 3483.)

The SBRM Amendment also provides that in a year in which "external operational constraints" prevent NMFS from "fully implementing the required at-sea observer coverage levels," the Regional Administrator will consult with the Regional Councils "to determine the most appropriate prioritization for how the available resources should be allocated." (AR 3954; *see also* AR 3465-66.) The SBRM Amendment calls for the Regional Administrator to provide the Regional Councils with data and a recommendation for prioritization that takes into account a variety of factors, including:

> [m]eeting the immediate and anticipated data needs for upcoming stock assessments; legal mandates of the agency under other applicable laws, such as the Endangered Species Act or Marine Mammal Protection Act; meeting the data needs of upcoming fishery management actions, taking into account the status of each fishery resource; improving the quality of discard data across all fishing modes; and/or any other criteria identified by NMFS and/or the Councils.

(AR 3465-66.) Plaintiff characterizes this prioritization process as a "loophole" that NMFS has used to "ignore the established methodology." (Pl.'s Mot. at 20-21.) Specifically, plaintiff contends that in 2008 and 2009, NMFS cited funding shortfalls as "external operational constraints" to avoid allocating the number of observer coverage days needed to reach the 30 percent CV performance standard. (*Id.* at 21.) Plaintiff equates the prioritization "loophole"

with the 5 percent "observer goal" rejected by the Court in *Oceana I* and *II*, in that the SBRM

Amendment's prioritization process means that the 30 percent CV performance standard is

necessarily *not* mandatory.  (*Id.*)  *See also Oceana I*, 2005 WL 555416, at *39 (finding that

Amendment 13 "d[id] not contain a mandatory level of observer coverage" or "contain any new

bycatch reporting methodology").  Plaintiff also maintains that the prioritization process is an *ad

hoc* approach to bycatch reporting that "starts afresh year after year guided by no generalized

method established in the fishery management plan" and reduces the Regional Councils to

"consultants" to the Regional Administrator.  (Mem. of Pl. Oceana in Supp. of Its Mot. for

Summ. J. & In Opp'n to Defs.' Mot. for Summ. J. ["Pl.'s Reply"] at 5-6.)

        The Court cannot accept plaintiff's depiction of the SBRM Amendment's prioritization

process as "functionally the same" as that which the Court rejected in *Oceana I* and *II*.  In those

cases, the Court's fundamental problem with the amendments at issue was that they contained *no*

mandatory bycatch reporting standards or procedural provisions.  *See*, *e.g.*, *Oceana II*, 384 F.

Supp. 2d at 232 (Amendment 10 "fail[ed] to establish a bycatch reporting methodology, but

instead gives complete discretion to the Regional Administrator"); *id.* at 233 (Amendment did

not "set forth . . . techniques" or "target[] a specific level of observer coverage by area that

would produce statistically reliable estimates of bycatch"); *id.* at 234 (Amendment did not

indicate "how the Regional Administrator should determine the 'distribution [of sea sampled

trips] by gear and area'" (alteration in original)); *Oceana I*, 2005 WL 555416, at *39 (noting that

Amendment 13 contained "among its 'approved measures' no specific mention of bycatch

reporting"); *id.* at *40 (Amendment "merely suggest[ed] a hoped-for result, as opposed to

'establish[ing]' a particularized methodology" (alteration in original)); *id.* at *43 (Amendment

"does not mandate a 'standardized reporting methodology'").  By contrast, the SBRM

Amendment states that it will "ensure" that the data collected is sufficient to produce a CV of no more than 30 percent. (AR 3273.) It then sets forth procedures by which at-sea observers are to be allocated to meet the 30 percent standard. (AR 3437, 3953-54.) These procedures "provide decisionmakers and the public with a program of what actually will be *done* to improve bycatch reporting," *Oceana II*, 384 F. Supp. 2d at 234, unlike the amendments rejected by the Court in *Oceana I* and *II*.

The prioritization process established by the SBRM Amendment to address budget shortfalls and other "external operating constraints" does not give "complete discretion" to the Regional Administrator to determine what, if any, bycatch reporting methodology should be used. (*See* AR 3465-66.) Instead, the prioritization procedures govern the Regional Administrator's allocation of observers in the event that he or she cannot follow the SBRM Amendment mandate regarding the level of coverage. The Regional Administrator must start by identifying the allocation of observer days needed to meet the 30 percent CV standard and then note the "coverage levels that would be available if the resource shortfall were allocated proportionately across all applicable fisheries." (*Id.* 3465.) Thereafter the Regional Administrator is to recommend alterations to that proportional distribution based on a series of factors identified in the SBRM Amendment, such as the need to comply with the Marine Mammal Protection Act and the Endangered Species Act. (*Id.*) The Regional Councils "may choose to accept the proposed observer coverage allocation or to recommend revisions or additional considerations for the prioritized observer allocations ultimately adopted and implemented" by the Regional Administrator. (AR 3954.)

Unlike Amendment 10 in *Oceana II*, this procedure does not link the number of observers to a "funding mechanism" without consideration of the adequacy of the coverage. *See*

384 F. Supp. 2d at 232.  Rather, it establishes an adequate level of coverage based on scientific evidence, independent of financial or other considerations, but it goes on to provide a contingency plan in the event that practical limitations, beyond NMFS' control, prevent the agency from meeting the CV standard.  (AR 3465, 3953-54.)

The MSA requirement that the FMP establish a standardized bycatch reporting methodology does not mean that the agency may not deviate from the standardized methodology regardless of the external factors that impact the agency.[14]  Accordingly, the Court concludes that the SBRM Amendment sufficiently satisfies the MSA's bycatch reporting requirement.  The prioritization procedures do not do away with the methodology established by the SBRM Amendment, which is not optional and may not be discarded because NMFS decides it does not want to use it.  (*See* AR 2089 ("[t]he methodology contemplated under the preferred alternatives of the Amendment Document is nondiscretionary"); AR 3274 (prioritization process used only "[i]n any year in which external operational constraints would *prevent* NMFS from fully implementing the *required* at-sea observer coverage levels") (emphases added); AR 3756 ("The performance standard is not proposed to serve as a mere target, but is an objective measure of the level of observer coverage necessary to achieve the level of precision specified in the

_____

[14] Oceana argues that the MSA does not include an "escape clause provision" that permits the agency to establish reporting on an *ad hoc* basis each year, but rather mandates that the agency "establish a standardized bycatch reporting methodology."  (Pl.'s Reply at 6.)  The Court agrees that the MSA does not allow the agency to develop an FMP that leaves the SBRM open to revision at the agency's whim or makes the use of the methodology optional, such that the agency could decide one year not to implement the observer program at all.  *See Oceana I*, 2005 WL 555416, at *40.  Indeed, this Court's critique of Amendment 13 in *Oceana I* focused largely on the language in the Amendment that indicated "only an 'intent' to implement an adequate program," rather than an obligation.  *Id.*  However, the SBRM Amendment establishes a mandatory level of observer coverage, and the agency has no discretion to change that level.  (AR 3274.)  Only when outside factors prevent the agency from proceeding as it is obligated to do by the SBRM Amendment do the prioritization procedures take effect, and then, those procedures are only in effect until the next year, when the default 30 percent CV standard applies again.  (*Id.*)

amendment.").)  Rather, the SBRM Amendment requires the agency to use the reporting

methodology each year, unless something "external," or outside the agency's control, prevents it

from doing so in a given year.  (AR 3465.)  Even then, changes to the number of observer days

are keyed to the level needed to meet the established bycatch reporting standard of 30 percent,

deviating only based on the external constraints and other specified factors.  (AR 3954.)  To the

extent plaintiff takes issue with the type of prioritization procedures included in the amendment,

as opposed to other approaches[15] that might have been adopted, the Court finds that NMFS'

decision to prioritize coverage as described in the SBRM Amendment, allowing Regional

Councils and the Secretary to make decisions based on current needs and priorities, does not

violate the MSA.

        **B.**      **Application of Performance Standard to Select Bycatch Species**

Plaintiff also attacks the SBRM Amendment because it "excludes all non-federally

managed species from its methodology" and "restricts its 30 percent CV performance standard to

federally managed species."  (Pl.'s Mot. at 18, 22.)  Specifically, plaintiff takes issue with

NMFS' decision[16] not to consider non-federally managed species in designing and developing

_____

[15] In a September 24, 2007 letter to Regional Administrator Patricia Kurkul, plaintiff proposed alternative approaches for dealing with budget shortfalls, such as requiring fishing vessels to supplement federal funding so that the SBRM-required levels could still be maintained, cutting the budget allocations pro rata across all fishing modes, or ranking fishing modes by some standard of priority and requiring that the observer needs be fully met for each mode in descending priority rank until the money runs out.  (AR 3193.)

[16] In the section discussing the 30 percent CV performance standard, the SBRM Amendment states:

> Because the explicit inclusion of additional, non-FMP managed species (other than those required under the law), is not necessary to ensure that data on the discards of these species is collected and available for review and/or use in stock assessments, and is beyond the scope required for the SBRM Amendment, the need to explicitly consider non-managed species in the design and

certain aspects of the SBRM Amendment, despite the MSA's mandate that the agency develop a methodology to assess the amount and type of all "bycatch." (*See id.*; AR 3470.) *See also* 16 U.S.C. § 1853(a)(11) (mandating the establishment of a "standardized [bycatch] reporting methodology" that includes conservation and management measures that" minimize bycatch and bycatch mortality "to the extent practicable").

An NMFS analysis of bycatch data from 2004 revealed that observers reported discards of 211 unique species, 59 of which are federally managed under an FMP for the Mid-Atlantic and/or New England regions or by federal statute (*i.e.*, the Marine Mammal Protection Act and the Endangered Species Act). (*Id.* 3468-69.) These 59 species constituted the vast majority (84.4 percent by weight) of the discarded bycatch in 2004. (*Id.*) The remaining 152 species, comprising 15.4 percent of the 2004 bycatch, are either unregulated or are regulated only at the state level. (*Id.*) Importantly, as demonstrated by the data from 2004, fishery observers collect data regarding all discarded species, whether federally managed or not. (*Id.* 3470 ("Observers are trained and expected to record information regarding 611 species . . . and observers do so for both discards and landed catch.").) However, for purposes of developing the 30 percent CV performance standard in the SBRM Amendment and allocating observer days to ensure sufficient bycatch reporting, NMFS decided that it did not need to take into consideration non-federally managed species. (*Id.* 3469-70; *see also* Defs.' Opp'n at 27.) Put another way, NMFS collects data regarding all bycatch species, whether federally regulated or not, but the allocation of observers to comply with the 30 percent performance standard is "crafted around" only federally managed species, meaning the precision of the data collected on non-federally managed species

---

development of the SBRM was eliminated from further consideration, other than to continue to ensure that all species (managed and nonmanaged) encountered by observed fishing vessels are reported either as landings or discards. (AR 3470.)

is not regulated in the same way as it is for managed species.  (AR 3959; *see also id.* 3458 (CV standard "addresses the precision of the estimates, not the accuracy of the estimates").)

Plaintiff argues that to comply with the MSA's requirement that FMPs assess "bycatch," NMFS must apply the 30 percent CV performance standard to all bycatch species in determining the number and allocation of observer days, because the statutory definition of bycatch does not distinguish between federally managed and unmanaged species.  (Pl.'s Mot. at 23 (citing 16 C.F.R. § 1802(2).)  The Court agrees that the MSA demands assessment of the bycatch of all species, not just those species that are federally managed—but this is satisfied by the requirement that at-sea observers compile data on all bycatch observed.  However, the statute is silent as to the method(s) to be used for bycatch assessment, and it includes no requirement that all species of bycatch be estimated[17] with the same degree of precision and accuracy.  It is therefore not improper to adopt, for example, a 30 percent CV performance standard—which itself permits a certain level of imprecision in reporting—but to limit its application to the bulk, in terms of weight, of bycatch.  Both the CV standard chosen and its application are designed to estimate bycatch by capturing the vast majority of animals caught while allowing some level of estimation error.  The assessment of some species more precisely than others does not, as plaintiff suggests, "exclude" certain types of bycatch from the SBRM; rather, it measures those species differently.[18]

---

[17] The MSA does not preclude NMFS from adopting various techniques designed to *estimate* the amount of bycatch.  Indeed, the purpose of the SBRM is to *estimate* the bycatch in federal fisheries, because reporting all bycatch at every fishery is not possible.  (*See* AR 3244 ("[A]n SBRM can be viewed as the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries."); 3959.)

[18] Plaintiff argues that the agency's establishment of the 30 percent CV performance standard for bycatch data collection acknowledged "an inadequacy in its [earlier] bycatch collection program, which did not establish or comply with a performance standard."  (Pl.'s Reply at 10.)  Plaintiffs contend that the failure to apply that standard to all bycatch perpetuates

In short, the MSA requires NMFS to assess bycatch at federal fisheries, but it gives the agency discretion to adopt appropriate assessment methods. The Court therefore concludes that the decision to allocate observers to ensure that the 30 percent CV performance standard is met with respect to most, but not all, bycatch species, while still estimating all bycatch, does not violate the MSA.

## III.     SUFFICIENCY OF THE SBRM AMENDMENT UNDER THE APA

The APA obligates a reviewing court to set aside and hold unlawful any agency "action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Oceana contends that the agency violated the APA by failing to adequately address 1) the concerns raised by the McAllister Report and 2) the statistical findings and best available science on the issue of bias. (Pl.'s Mot. at 25.)

### A.     NMFS Response to the McAllister Report

In response to the NMFS request for comments on the Final Draft of the SBRM Amendment (AR 3076), the Lenfest Ocean Program commissioned the McAllister Report, a 39-page independent review of the SBRM draft by a fisheries science expert. The report was sent to the NMFS Regional Administrator on September 24, 2007, the last day of the comment period. (Pl.'s Mot. at 6; AR 3120.) On October 2, agency officials conducted a conference concerning

---

the deficiency of the earlier program. (*Id.*) The Court disagrees. As discussed, the problem with the earlier FMPs was that they failed to establish *any* methodology, not that the methodology was inadequate. *Oceana II*, 384 F. Supp. 2d at 232 (Amendment 10 "does not set forth the substance of a reporting methodology"); *Oceana I*, 2005 WL 555416, at *43 (Amendment 13 "does not mandate a 'standardized reporting methodology"). In contrast to these earlier FMPs, the SBRM Amendment establishes a mandatory reporting methodology that allocates at-sea observers based on a precision level as applied to federally managed species. Once the observers are allocated, they report on all bycatch, not just federally managed species, as required by the MSA. (AR 3459.)

the agency's response to the report. (AR 3212.) NEFSC agreed to prepare a decision memorandum,[19] "sufficient to allow the Regional Administrator to move forward with a recommended decision on the SBRM Amendment" by the October 22, 2007 deadline, and a more detailed response shortly after the decision date to include in the preamble to the final rule. (AR 3213.) NEFSC submitted its four-page summary response on October 18.[20] (AR 3882.) The response concluded that while the agency would incorporate some of Dr. McAllister's suggestions "into the evolution of the SBRM," his "critique d[id] not provide a sufficient basis to disapprove the SBRM Amendment." (*Id.* at 3882-83) The NMFS Assistant Administrator approved the SBRM Amendment on October 22. (Pl.'s Mot. at 6-7; AR 3882-85, 3887.)

On December 20, 2007, NEFSC submitted a second, more detailed, 10-page response to the McAllister Report (AR 3919-28), which was then included in the Notice of Final Rule that was released by the agency on January 28, 2008. (*Id.* 3962-66.) The second NEFSC response "provided additional technical justification for the approaches that have been taken and summarized additional work that has been conducted since the September 2007 report by Dr. McAllister." (*Id.* 3919.) The response went on to reference the working papers regarding discard estimation prepared for a Groundfish Assessment Review Meeting ("GARM")[21] that

_____

[19] The decision memorandum was to "clearly identify[] the major comments raised by members of the public on the amendment and include[] an assessment of the significance of those comments and whether any, including the technical comments identified in the McAllister Report, [we]re substantial enough to warrant disapproval of part or all of the SBRM Amendment." (AR 3212.)

[20] The agency's responses to comments other than Dr. McAllister's were submitted on October 15, 2007. (AR 3221-38.)

[21] On October 29, NEFSC began GARM III, the third in a series of periodic regional scientific peer reviews designed to provide benchmark assessments for the groundfish stocks managed by the NEFMP. (*See* AR 1079, 4770.) Working papers were drafted in anticipation of the October 29 GARM meeting, at least two of which concerned the topic of discard estimation, which was the subject of the McAllister Report. (*See id.* 4713, 4750.) The four sessions of GARM III took place between October 2007 and August 2008. (*Id.* 4770.) The first meeting

took place on October 29 and noted that "[s]everal of the validation issues highlighted by Dr. McAllister were examined" at that meeting. (*See id.* 3924-26.) The response also stated that as a result of recommendations in the McAllister Report, the agency conducted simulation tests of "alternative estimators," the results of which were also discussed at the GARM. (*Id.* 3925.) The response concluded, consistent with the NEFSC summary response submitted on October 18, that while the agency acknowledged the utility of Dr. McAllister's comments and suggestions, it continued to support the approach taken in the SBRM Amendment. (*Id.* 3919.)

Oceana now argues that NMFS "relegated its substantive review of the McAllister [R]eport to the GARM [meeting], held one week *after* the agency approved the SBRM Amendment." (Pl.'s Mot. at 26.) As such, plaintiff maintains that the agency's December 20, 2007 response to the McAllister Report was an arbitrary and capricious "*post hoc*" justification of its approval of the SBRM. (*Id.*) In support of this argument, plaintiff cites *Brookings Municipal Telephone Company v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987), where the D.C. Circuit required an agency to "demonstrate a 'rational connection between the facts found and the choice made,'" *id.* at 1165 (quoting *Farmers Union Cent. Exch., Inc. v. FERC,* 734 F.2d 1486, 1499 (D.C. Cir. 1984)), but cautioned that "[*p*]*ost hoc* rationalizations advanced to remedy inadequacies in the agency's record or its explanation are bootless." *Id.*

Plaintiff's citation to *Brookings*, is, however, inapposite. *Brookings* (and *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983), upon which *Brookings* relies) involved instances where the agency's attorneys attempted to justify the agency's actions with rationales that had not been formulated or articulated at the time the agency had decided to act. *See State Farm*, 463 U.S. at

---

took place between October 29 and November 2, 2007, and reviewed seven types of data inputs (landings, discards, tagging, fishery independent and dependent surveys, ecosystem, and recreational). (*Id.*)

49-50 (dismissing arguments in support of agency's position in court briefs because "the[y] [we]re not the agency's reasons for" its decision); *Brookings*, 822 F.2d at 1170 (dismissing arguments "posed for the first time in the [agency's] briefs to this court" as "no[] excuse [for] fail[ing] to consider significant alternatives at the agency level").  As the Supreme Court noted, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *State Farm*, 463 U.S. at 50; *see also Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 469 (D.C. Cir 1998) ("[W]e may consider only the regulatory rationale actually offered by the agency during the development of the regulation, and not the post-hoc rationalizations of its lawyers.").

Here, NMFS did not ignore the McAllister Report during the SBRM Amendment approval process, only to manufacture reasons for rejecting the report during the pendency of this litigation.  Rather, the agency concluded that the McAllister Report did not provide a sufficient basis for disapproval of the SBRM Amendment.  (AR 3882; 3890.)  The agency submitted a four-page memorandum supporting that conclusion to the Regional Administrator, discussing Dr. McAllister's points and stating its disagreement with some of his positions.  (*See, e.g.*, *id.* 3884 (noting that NEFSC "disagree[s] with Dr. McAllister that the levels of bias inherent in the data preclude their use in the proposed SBRM" and explaining that "multiple lines of evidence used in the SBRM suggest that any potential bias that may exist in our observer data does not impugn the overall program").)[22]  The memorandum demonstrates that NMFS

_____

[22] Plaintiff argues that the October 18 NEFSC memorandum is little more than "sweeping generalizations" that "made no point of contact with Dr. McAllister's discussion, did not acknowledge the flaws he identified, and did not consider the solutions that he offered."  (Pl.'s Reply at 17.)  The October 18 memorandum belies these claims.  For example, the agency clearly acknowledges the two major critiques of the McAllister Report—namely, the use of the combined ratio estimator (as opposed to alternative estimators) and the use of at-sea observer data (as opposed to fishing vessel trip reports).  (AR 3882.)  The memorandum also states that: 1) at Dr. McAllister's suggestion, the agency ran "simulation tests of alternative estimators" and

23

"considered the relevant factors and articulated a rational connection between the facts found" and its choice to approve the SBRM Amendment despite Dr. McAllister's critique. *Balt. Gas & Elec. Co.*, 462 U.S. at 105.

The NEFSC's supplementation of its October 18 memorandum after the agency approved the SBRM Amendment, but prior to the release of the final rule, does not constitute *post hoc* rationalization in violation of the APA. The December 20 memorandum simply supplements the agency's October 18 conclusion that the McAllister Report does not provide a basis for disapproving the SBRM Amendment and that the methods used in the SBRM are well-supported.[23] (*Compare* AR 3882-84 (confirming SBRM Amendment use of combined ration estimator and at-sea observer data) *with id.* 3921-25 (discussing use of combined ratio estimator and potential bias in at-sea observer data); *see also id.* 3925-26 (discussing results of simulations and studies referenced in October 18 memorandum).) It underscores and explicates the agency's

---

that the "initial findings support the use of the discard to total kept ratio and the simple expansion method;" 2) the agency "conducted studies to estimate total landings from the observed sample data, and found good agreement for the methods used in the SBRM;" 3) the agency rejects Dr. McAllister's proposed estimator because the estimator is but one component of the overall SBRM and switching out the combined ration estimator "would not change the fundamental process proposed in the SBRM Amendment to allocate observer coverage;" and 4) the agency disagrees with Dr. McAllister's conclusion that the bias in the data sets preclude their use in the SBRM Amendments "[b]ased on [the agency's] extensive experience with these data sets." (AR 3882-84.) The agency clearly reviewed the McAllister Report and responded to its criticisms, which is what the APA demands. *See Balt. Gas & Elec. Co.*, 462 U.S. at 105.

[23] Plaintiff seizes on the agency's reliance on the GARM working papers in the December 20 memorandum as evidence that NMFS only substantively considered the McAllister Report at the GARM meeting, which took place one week after the agency's October 22 approval of the SBRM. Yet, the record is clear that the agency took steps to review (AR 3212-13) and respond to (AR 3882-85) the McAllister Report within three weeks of receiving it—and four days before approving the SBRM Amendment. That the McAllister Report was discussed more fully at GARM III, and information prepared for the meeting used to supplement the agency's October 18 findings, does not suggest that NMFS relegated substantive review of the Report until after the approval of the SBRM Amendment. Rather, it lends credence to the agency's claims that it "took Dr. McAllister's comments seriously and fully considered them," even after it had issued preliminary findings and approved the SBRM Amendment. (Defs.' Mot. at 22.)

reasons for the decision; it does not create new reasons.[24]

In sum, the Court finds that NMFS adequately considered the McAllister Report during the rulemaking process and sufficiently explained its decision to approve the SBRM Amendment despite the report's criticisms.[25]   It therefore concludes that the agency did not act arbitrarily or capriciously in violation of the APA.

**B.**     **NMFS Consideration of and Response to Comments Regarding Bias**

Plaintiff also argues that NMFS violated the APA because it failed to adequately consider bias in developing the SBRM Amendment.  (Pl.'s Mot. at 27.)  The SBRM Amendment acknowledges the importance of "[e]liminating potential sources of bias" in order to "improve[] the accuracy of the results."  (AR 3383, 3541.)  However, plaintiff maintains that despite the effect of bias on the results of the SBRM, the agency "never explain[s] what level of bias it

---

[24] But even if the Court were to conclude that the agency failed to adequately consider the McAllister Report prior to its decision to approve the SBRM Amendment (which it does not), any such failure did not affect the outcome of the agency's decision, because the December 20 memorandum, like the October 18 memorandum, clearly supports SBRM approval.  Therefore, any arguable error would be harmless and would not warrant remand of the SBRM Amendment to the agency.  *See PDK Labs. Inc. v. DEA,* 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.")

[25] In its Reply, plaintiff also argues that NMFS "predetermined" the outcome of its response to the McAllister Report before fully reviewing it, citing the minutes from the October 2, 2007 conference call.  (Pl.'s Reply at 13-14.)  During the call, Ms. Kurkul asked whether "any [of the critiques in the McAllister Report] are sufficiently serious to indicate that a different approach to the design of the SBRM is necessary or warranted."  (AR 3212.)  An NEFSC staff member responded that "a different approach would not be necessary, and that, while many of the issues raised by McAllister are relevant to the analyses supporting the SBRM, none rise to the level of a fatal flaw that would require the SBRM Amendment to be disapproved."  (*Id.*) This exchange does not suggest that the agency "approached its consideration of the McAllister Report having already decided that nothing in the report would influence its final decision on the SBRM Amendment."  (Pl.'s Reply at 14.)  Rather, the minutes clearly state that the NEFSC staff had already "had an opportunity to review and consider the issues raised in the McAllister Report" and that the purpose of the call was "to brief Regional Office staff on the significance and implications of the issues raised in the report."  (AR 3212.)  Therefore, contrary to plaintiff's contention, the record does not support the inference that the agency had decided to ignore the McAllister Report before reading or considering it.

would find unacceptable."[26] (Pl.'s Mot. at 28.) Further, although the McAllister Report highlighted the lack of a standard to evaluate bias (*see* AR 3132 (describing SBRM Amendment's evaluation of bias without objective quantitative basis to judge bias as "rather arbitrary")), the agency failed to adequately respond to this portion of the Report. Oceana also claims that NMFS "failed to rationally respond to Dr. McAllister's critique that bias seriously compromised the SBRM." (Pl.'s Mot. at 29.) Such disregard for Dr. McAllister's significant critique of the SBRM Amendment, plaintiff argues, demonstrates that NMFS' decision to approve the SBRM Amendment was arbitrary and capricious. (*Id.*)

"[A]n agency rule [is] arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. "The agency 'need not address every comment, but it must respond in a reasoned manner to those that raise significant problems.'" *City of Waukesha v. EPA*, 320 F.3d 228, 257-58 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regulatory Comm'n,* 105 F.3d 715, 722 (D.C. Cir. 1997). "Nevertheless, '[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *Id.* (quoting *Texas Mun. Power Agency v. EPA,* 89 F.3d 858, 876 (D.C. Cir. 1996)); *see also Am. Iron & Steel Inst. V. EPA,* 115 F.3d 979, 1005 (D.C. Cir. 1997).

---

[26] Defendant objects to plaintiff's argument regarding the agency's failure to respond to Dr. McAllister's comment regarding the lack of an objective bias standard, claiming that this argument is vague and was not included in the complaint. (Defs.' Opp'n at 14.) Plaintiff's amended complaint alleges that McAllister Report and Oceana's own letter to the agency "identified numerous technical flaws" in the SBRM Amendment, but does not cite the absence of an objective bias standard specifically. (Am. Compl. ¶ 65.) However, because the Court concludes that NMFS sufficiently considered the issue of bias and adequately responded to Dr. McAllister's critiques, it need not resolve this objection.

The record belies plaintiff's argument that NMFS failed to consider the issue of bias in developing and approving the SBRM Amendment. Indeed, the SBRM includes numerous discussions of bias and the steps taken to minimize it, including an entire chapter (Chapter 5) devoted to the topics of sampling design, precision, and accuracy. (*See*, *e.g.*, AR 3245 ("Analyses were performed to evaluate potential sources of bias in the 2004 NEFOP data in order to characterize the accuracy of the data. In general, there was no evidence of a systematic bias in the amount of kept pounds, trip duration, or area fished between NEFOP and FVTR data, indicating that the data are sufficiently accurate."); 3272 ("The Northeast Region SBRM shall employ sampling designs developed to minimize bias to the maximum extent practicable."); 3364 ("As with shore-based intercept sampling, the method for assigning samplers to ride aboard head/party boats helps to ensure each vessel trip has an equal probability of being sampled and minimize sampling bias and increase precision."); 3383 ("Later sections of this chapter address the statistical properties of the estimators, and provide evidence that there is very little bias associated with the data collected by the at-sea observers."); 3400 ("In general, the ratio estimate has a bias of order $1/n$ (Cochran 1963). For moderate and large sample sizes, the bias is negligible."); 3411-13 ("An examination of the distribution of these differences (Appendix B, Figures B-8 and B-9), by species group, indicates no evidence of systematic bias and general symmetry in the pattern of positive and negative differences."); 3656 (discussing tests conducted to "to address the potential sources of bias by comparing measures of performance for vessels with and without observers present"); 3584-90 (rebutting arguments by Babcock et al. regarding bias and discussing tests conducted to address potential sources of bias in the Northeast Fisheries Observer (Sea Sampling) Program)).

In response to the McAllister Report's specific criticisms regarding bias in the SBRM, the October 18, 2007 NEFSC memorandum states that the agency "disagree[s] with Dr. McAllister that the levels of bias inherent in the data preclude their use in the proposed SBRM" based on its "extensive experience with these data sets." (AR 3884.) The agency cites "multiple lines of evidence used in the SBRM" that suggest that "any potential bias that may exist in [the] observer data does not impugn the overall program." (*Id.*) NEFSC also notes that the "proposed SBRM analyses were reviewed and accepted by a peer-review panel . . . comprising members of the Scientific and Statistical Committees of the New England and Mid-Atlantic Fishery Management Councils," [27] which "concluded that the SBRM represented a reasonable and scientifically sound approach." (*Id.* 3885.) The agency further discussed the issue of bias in response to questions raised in the McAllister Report in the December 20, 2007 memorandum. (*Id.* 3924-3925.) Finally, the agency devoted three-and-a-half pages of the Notice of Final Rule to a summary of the McAllister Report and a response to various issues raised therein.[28]

---

[27] Plaintiff argues that material in the record created before the McAllister Report was submitted (which includes portions of the SBRM Amendment and the review of the Amendment by the Regional Councils) cannot be counted as a "response" to the issues raised in the Report. (*See* Pl.'s Reply at 22.) However, the Court notes that "'[an agency's] failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *City of Waukesha*, 320 F.3d at 258. The record is replete with discussions of the potential problem of bias, indicating that the agency considered a variety of factors related to this issue before and after it received the McAllister Report. The record thus suggests that any failure of the agency to address a particular critique in the Report is not significant, given its extensive attention to the issue of bias.

[28] Plaintiff argues that the agency's response to Dr. McAllister's comments contained in the Notice of Final Rule is a *post hoc* rationalization, because it was drafted and released after the agency's decision to approve the SBRM Amendment. (Pl.'s Reply at 23-24.) As discussed, the Court must look to the "regulatory rationale actually offered by the agency during the development of the regulation." *Grand Canyon Air Tour Coal.*, 154 F.3d at 469. The fact that the agency's formal response to the McAllister Report was issued after the SBRM Amendment was approved is not dispositive of whether the response is *post hoc*. Indeed, the response cites to analyses contained in the SBRM Amendment, as well as studies also cited in the SBRM Amendment. (*Compare*, *e.g.*, AR 3964 (responding to McAllister Report critique of estimators

It is clear that the agency devoted extensive time and resources, including expert review, to the potential problem of bias. Any failure on the part of the agency to respond specifically to a particular comment or criticism contained in the 39-page McAllister Report is, in light of the agency's overall consideration of the topic of bias, insignificant. *City of Waukesha*, 320 F.3d at 257-58. To the extent that Dr. McAllister disagrees with the agency's conclusions regarding bias, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *see also Oceana I*, 2005 WL 55416, at *16 ("It is simply not the Court's role to interject itself into this extremely technical scientific debate; indeed, this is precisely the type of issue in which the Court should properly defer to Defendants' expertise.") Given the agency's extensive consideration of the issue of bias generally, as well as its many responses to the critiques contained in the McAllister Report, the Court concludes that NMFS did not act arbitrarily or capriciously in approving the SBRM.

### C. NMFS Consideration of and Response to Comments Regarding Adequacy of Precision Standard for Rarely Encountered Species

Plaintiff also argues that NMFS acted arbitrarily and capriciously in adopting a 30 percent CV performance level and in failing to respond to Dr. McAllister's contention that such a standard is inadequate for rarely encountered species and will result in substantial cumulative error over time. (Pl.'s Mot. at 31-34.) In his report, Dr. McAllister argued that the "one-shoe

---

used in SBRM Amendment by citing studies by Pikitch, Stratoudakis , and others, concluding that such estimators are adequate) *with* AR 3397 (SBRM Amendment discussion of bias, citing same studies).) These studies are also included in earlier drafts of the SBRM Amendment. (*See*, *e.g.*, *id.* 456.) The record therefore supports the conclusion that the justifications offered by NMFS in its response to the McAllister Report in the Notice of Final Rule are the same rationales the agency actually relied on in developing and approving the Amendment, not *post hoc* rationalizations created after the fact.

size fits all approach" regarding the performance standard "is inadequately justified and inappropriate for the vast majority of fishing mode-protected species combinations." (AR 3156.) However, he notes that "[w]hether it would be an overall better approach to tailor bycatch estimators to each particular species-fishing mode combination is a difficult issue" and "would require a lot more work than the preparation of an SBRM like the present one that applies a single bycatch estimation method to all instances." (*Id.*)

In response to Dr. McAllister's critique, NMFS stated in the Notice of Final Rule that

> The SBRM addresses discarding issues for the entire range of fishing activities in the Northeast. This synoptic approach requires careful attention to the limitations and availability of data to estimate discards and provides a representative methodology to apply consistently across all Northeast Region fisheries. *The inclusion of all species and all fisheries precluded a detailed case-by-case treatment of the best estimators in favor of a standardized approach to provide reasonable results across the full range of Northeast Region fisheries.* The SBRM incorporates objective approaches to reduce the estimation problem to a subset of cells that are biologically important.

(*Id.* 3963 (emphasis added).) It further notes that "[t]he SBRM is fully consistent with the limitations of the data necessary to support estimation of discards across a wide range of species and fisheries." (*Id.*) Moreover, the SBRM Amendment itself addresses the topic of using alternate CV levels, both within and outside the 20 to 30 percent range. (AR 3474.) The Amendment specifically states that "[a]lthough briefly considered by the Councils early in the process to develop this amendment, establishing separate and distinct CV levels for each particular combination of fishing mode and species was not pursued further." (*Id.*) The Amendment explains this decision by noting that "there was no scientific justification for choosing a CV level outside the range of 20-30 percent recommended in NMFS (2004)" and that the "approach was not pursued further due to a lack of information necessary to make informed

decisions regarding the cell-by-cell CVs." (*Id.*) Finally, there are numerous examples in the record of the agency's consideration of the 30 percent CV performance standard and the scientific support for that level. (*See*, *e.g.*, *id.* 0005 (listing fisheries managers and scientists consulted regarding the methodological approach for determining bycatch); 72-74 (discussing benefits of 20-30 percent CV standard); 350 (discussing possible CV alternatives, including "[c]ell by cell CVs (determined individually)" and an "[a]cross the board 30% CV for all cells").

The agency considered a variety of factors in settling on a uniform 30 percent CV level, including whether to use different CV levels for different species. The Court finds that the NMFS decision to use a 30 percent CV level, and its response to Dr. McAllister's critique, is reasonable in light of the relevant factors. *See Balt. Gas & Elec. Co.*, 462 U.S. at 105 (court's only task is to "determine whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made"); *see also City of Waukesha*, 320 F.3d at 258 (agency's failure to respond directly to comments is significant only where "agency's decision was not based on a consideration of the relevant factors"). Dr. McAllister's disagreement with the agency's conclusions does not provide a basis for finding NMFS' actions to be arbitrary and capricious, for NMFS has "discretion to rely on the reasonable opinions of its own qualified experts." *Marsh*, 490 U.S. at 378; *see also Am. Trucking Ass'n, Inc.*, 283 F.3d at 362 (function of court is not to "resolve disagreement among the experts or to judge the merits of competing expert views"). The various scientific and economic policy judgments made by NMFS in adopting the SBRM Amendment and the 30 percent CV level are precisely the types of decisions to which the Court must defer. *See Mosbacher*, 732 F. Supp. at 223. Indeed, even Dr. McAllister noted that deciding whether to tailor the CV level to different species is a "difficult issue." (AR 3156.) The Court therefore concludes that NMFS did not act arbitrarily and

capriciously in deciding against such tailoring in favor of adopting the uniform standard recommended by experts.

## IV.  DECISION TO PERFORM ENVIRONMENTAL ASSESSMENT AND TO ISSUE FONSI

Oceana also challenges NMFS' decision not to conduct an EIS at the outset of the SBRM Amendment process, arguing that the available evidence demonstrates that the SBRM Amendment will significantly impact the environment.  (Pl.'s Mot. at 34.)  Specifically, plaintiff contends that the agency violated NEPA because it: 1) decided to issue a FONSI prior to developing the EA; 2) failed to adequately consider the cumulative impacts of adopting the SBRM; and 3) failed to consider meaningful alternatives to the "preferred" alternative in the EA. (*Id.* at 35, 38, 41.)

### A.  Decision to Issue a FONSI

NEPA "requires preparation of an [EIS] whenever a proposed major federal action will significantly affect the quality of the human environment."  *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983) (citing 42 U.S.C. § 4332(2)(C)).  "To determine the nature of the environmental impact from a proposed action and whether an EIS will be required, federal agencies prepare an environmental assessment."  *Id.* (citing 40 C.F.R. § 1501.4(b) & (c)). "If on the basis o[f] the Environmental Assessment the agency finds that the proposed action will produce 'no significant impact' on the environment, then an EIS need not be prepared."  *Id.* at 1412-13.

Plaintiff argues that over a year before it had completed an EA of the SBRM Amendment, the agency decided that it would find that the Amendment would produce no significant impact on the environment and that a further EIS would not be needed.  (Pl.'s Mot. at

35.)  Based on this premise, Oceana argues that NMSF predetermined the outcome of the EA

such that the resultant assessment was meaningless and the agency failed to perform its duty to

take a "hard look" at its actions in terms of their impact on the environment.  (*Id.*)  *See also*

*Peterson*, 717 F.2d at 1412 (agencies are required to take a "hard look" at the problem of

environmental impact).  Plaintiff bases its allegation on various documents in the record,

including: 1) January 2006 agency meeting minutes stating that "the agency is under court order

to fix the defects in [the FMP Amendments reviewed in *Oceana I* and *II* and that] [a]s a result, a

very aggressive schedule for development and implementation is needed to be responsive to the

court" (AR 220); 2) February 2006 minutes noting that meeting participants "discussed that the

amendment should be designed as a technical assessment of bycatch monitoring and reporting

[and that a]s such, an EA should be sufficient" (AR 232); 3) a later statement in the February

2006 minutes notes that "[t]he NEPA process provides for an EA to be conducted first and if the

right conclusions cannot be achieved, then an EIS can be performed" (AR 232-33); 4) an April

2006 SBRM Amendment timeline indicating that the agency planned to "submit" the EA in

October 2006 and "[a]pprove Amendment/sign FONSI" in March 2007, but also noting that an

EA was only "likely, depending on range of potential management measures to be considered"

(AR 278-79); and 5) an April 2006 "outline" of the SBRM Amendment noting that Chapter 9 of

the SBRM Amendment would contain discussion of NEPA and would contain a "draft FONSI

statement."  (AR 305.)  NMFS approved the EA and the FONSI a year and a half later in

October 2007.  (AR 3239.)

The Court finds that these documents are insufficient to demonstrate that the agency

prejudged the outcome of the EA.[29]  At most, these ambiguous statements suggest that NMFS

---

[29] Plaintiff also argues that the agency's submission of the SBRM Amendment for
approval at the same time as its submission of the EA (which was a part of the SBRM

expected that an EA would be sufficient given the anticipated nature of the SBRM Amendment, but there is no evidence that it was prepared to ignore contrary findings or to avoid having to conduct a proper EA in the first place.  Plaintiff's attempt to liken these documents to records in cases where courts have concluded that agencies have prejudged the outcome of the EA is unavailing.  For instance, in *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2004), the record showed that the consultant hired by the agency to prepare the EA was *contractually obligated* "to prepare a FONSI and to have it approved, signed and distributed by FHWA by a date certain." *Id.* at 1112.  In essence, the agency hired a consultant not to conduct an EA, but to prepare a FONSI. NMFS' proposed scheduling documents, however, do not suggest that the entity conducting the EA was obligated to come to a certain conclusion.  Similarly, in *American Wildlands & Native Ecosystems Council v. National Forest Service,* No. 97-160, 1999 U.S. Dist. LEXIS 22243 (D. Mont. 1999), the record contained a schedule for the proposed action that "presuppose[d] that no [EIS] w[ould] be required." *Id.* at *10.  Another document, an interagency memorandum, instructed the recipient to "[a]ssume that the amendment will not be significant, and that NEPA alternatives will be limited to those that would mitigate impacts of proposed action (if any)." *Id.* at *11.  Another document stated that the proposed agency action "will be a non-significant amendment." *Id.*  The court concluded that these documents indicated a "presumption that an

Amendment document) deprived the agency of the option of deciding to develop an EIS, since the only option available to the agency if it did not approve the EA would be to disapprove the Amendment and "start over from scratch."  (Pl.'s Reply at 30-31.)  The Court fails to comprehend the significance of the simultaneous submission of the EA and the Amendment.  It is not clear that the agency had anything more to lose by submitting the EA and the Amendment at the same time, rather than submitting the EA first.  A rejection of the Amendment on the grounds that the agency desired an EIS would not have invalidated the rest of the Amendment, requiring the agency, as plaintiff argues, to begin its development of the Amendment "from scratch."  (*Id.* at 31.)  Rather, NMFS would have been free to conduct an EIS and resubmit the Amendment for approval upon completion of the EIS.  To the extent that NMFS remained free to approve or disapprove of the EA and conduct an EIS if it desired, its submission schedule fails to demonstrate a prejudgment of the EA outcome.

[EIS] would not be called for under any circumstances." *Id.* at *9. In contrast, the documents cited by plaintiff explicitly note that an EA was only "likely"[30] (AR 278-79) and did not foreclose the possibility of an EIS.[31] (*Id.* 232-33.) As such, the Court concludes that the agency did not arbitrarily predetermine the outcome of its EA.

## B. Consideration of Cumulative Effects and Meaningful Alternatives

Even if the documents cited by plaintiff were sufficient to indicate the agency's prejudgment of the EA (which they are not), "an agency's intention or predisposition in drafting an EA is irrelevant if the EA itself ultimately satisfies requirements of NEPA." *Surfrider Found. v. Dalton*, 989 F. Supp. 1309, 1320 (S.D. Cal. 1998). "A court reviews an agency's FONSI . . . under the [APA] and 'cannot substitute [its] judgment for that of an agency if the agency's decision was fully informed and well considered.'" *Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008) (quoting *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 684 (D.C. Cir. 1982) (citations and quotation marks omitted)). "Cases in this circuit have employed a four-part test to scrutinize an agency's finding of 'no significant impact.'" *Peterson*,

---

[30] Other documents in the record also indicate that the agency did not foreclose the possibility of an EIS until the EA was completed. (*See, e.g.*, AR 221 ("Some discussion occurred on the level of [NEPA] analysis needed and whether an [EA] or [EIS] would be required. It was decided that an EA would suffice provided no significant impacts to the environment could be demonstrated."); *id.* 285 ("Another audience member asked if an [EIS] would be required. Mr. Pentony responded by stating that the determination at present is that an [EA] will be done first and if a [FONSI] cannot be supported, then an EIS will be developed per the NEPA process.").)

[31] A third case cited by plaintiff, *Sans Luis Valley Ecosystem v. U.S. Forest Service*, No. 04-cv-01071, 2007 U.S. Dist. LEXIS 36242 (D. Colo. May 17, 2007), involved a draft EA that initially stated that there was a "potentially significant effect to the scenic value of the area," but when a commenter noted that such language would require an EIS, the language was changed to state that there "could be substantial effects on the scenic values within this viewshed." *Id.* at *34. The court also found evidence that the agency was concerned about approving its action before certain appraisals expired, indicating the agency's motive for avoiding an EIS. *Id.* Plaintiff makes no such allegations here, and the record contains no suggestion that NMFS altered or doctored its EA findings to avoid an EIS.

717 F.2d at 1413. "[T]he court reviews an agency's finding of no significant impact to determine whether:

> First, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a 'hard look' at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (quoting *Sierra Club v. U.S. Dep't of Transp.,* 753 F.2d 120, 127 (D.C. Cir. 1985)).

The SBRM Amendment contains an eight-page EA that includes a detailed discussion of the potential environmental effects of the SBRM Amendment. Plaintiff argues that the NMFS EA is "skimpy." (Pl.'s Reply at 32.) But "the length of an EA has no bearing on the necessity of an EIS." *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006). "'What ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report.'" *Id.* (quoting *Heartwood, Inc. v. U.S. Forest Serv.,* 380 F.3d 428, 434 (8th Cir. 2004)). "[T]he agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust*, 290 F.3d at 342. To that end, plaintiff also maintains that the NMFS EA "omit[s] an analysis of cumulative impacts and a meaningful consideration of alternatives." (Pl.'s Reply at 32.)

### 1. Cumulative Impact

"Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions

36

regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The D.C. Circuit has held that "'meaningful cumulative impact analysis must identify' five things: '(1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and *reasonably foreseeable*—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.'" *TOMAC*, 433 F.3d at 864 (quoting *Grand Canyon Trust,* 290 F.3d at 345) (emphasis added).) Importantly, "NEPA does not require federal agencies to examine every possible environmental consequence. Detailed analysis is required only where impacts are likely." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981); *see also id.* ("Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary. So long as the environmental impact statement identifies areas of uncertainty, the agency has fulfilled its mission under NEPA.").

Plaintiff argues that NMFS disingenuously and misleadingly characterized the SBRM as "wholly administrative in nature." (Pl.'s Mot. at 39 (citing AR 2618).) Rather, plaintiff maintains that because the SBRM Amendment results in bycatch data, it will have a direct effect on fishing levels and quotas set by the agency. (*Id.* at 40.) As such, plaintiff argues that the bias in the Amendment will

> result in the misallocation of observer coverage, resulting in too much coverage in some areas and too little coverage in other areas, and these misallocations may possibly cause the agency to invoke its 'external operational constraint' loophole when a correct allocation of the coverage might allow the agency to continue following the SBRM.

(*Id.* at 41.)

The SBRM Amendment contains a section entitled "Summary Cumulative Effects Associated With the Preferred Alternative," which contains a three-page explanation of the agency's consideration of incremental impacts of the SBRM Amendment over time. (AR 3514-16; *see also id.* 3501-12 (describing "consequences" of SBRM Amendment generally).) NMFS states that because

> the actions being considered in this amendment focus solely on the administrative processes through which data and information on bycatch occurring in Northeast Region fisheries are collected, analyzed, and reported to fishery scientists and managers . . . it is not possible to conduct what is generally considered a traditional cumulative effects assessment for this action.

(*Id.* 3514.) The section goes on to state that none of the administrative aspects of the SBRM "intended to improve the effectiveness and the transparency of the Northeast Region SBRM" is "associated with impacts to any fishing areas or living marine resources within the Northeast Region that could be distinguished from the no action baseline." (*Id.* 3514-15.) It then notes that any possible "downstream" impacts of the Amendment, which is "focused on establishing a procedural methodology rather than on implementing changes to fishing operations," are not reasonably foreseeable. (*Id.* 3515.) To the extent that the SBRM Amendment results in bycatch data that necessitates changes to fishing operations, the agency concluded that such changes would be subject to a separate NEPA process, geared toward the specific impacts of those changes. (*Id.* 3516.)

The Court concludes that NMFS sufficiently considered the issue of cumulative effects and concluded that any potential downstream impacts were not "reasonably foreseeable and directly linked" to the Amendment. (*Id.* 3515). As such, the agency's EA analysis was sufficient under NEPA. *See* 40 C.F.R. § 1508.7 (cumulative impact is result of impact of action when combined with "reasonably foreseeable" future actions); *TOMAC*, 433 F.3d at 863 ("all

that can reasonably be expected" of agency conducting NEPA analysis is to analyze "impacts likely to occur"); *Izaak Walton League of Am.*, 655 F.2d at 377. With respect to plaintiff's speculation as to the possible future impact of bias, the agency, relying on its "extensive experience," concluded that bias in the data does not preclude their use in the SBRM Amendment. (AR 3884.) Because the agency has found that bias is not a problem, it need not to consider it as part of its NEPA analysis. That plaintiff disagrees with NMFS that bias is not likely to affect the operation of the SBRM Amendment is not a basis for this Court to conclude that the agency's analysis is deficient, as the agency is entitled to rely on its own expert findings. *Marsh*, 490 U.S. at 378.

### 2. Meaningful Alternatives

Oceana also argues that "in its haste to issue a FONSI," the agency failed to "meaningfully consider alternatives to some of the key decisions in the SBRM Amendment." (Pl.'s Mot. at 41.) Specifically, plaintiff contends that with respect to SBRM Element 3 (selection of the performance standard) and Element 6 (the prioritization process), the agency considered "only two alternatives: an illegal status quo and the agency's preferred alternative." (*Id.*) Plaintiff maintains that limiting the discussion of alternatives in an EA to the status quo and the proposed action is prohibited under NEPA. (*Id.*) *See also* 40 C.F.R. § 1508.9 (EA requires, *inter alia*, "brief discussions" of "alternatives as required by section 102(2)(E) [and] of the environmental impacts of the proposed action and alternatives"); *see also* 42 U.S.C. § 4332(E) (agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources"). Oceana argues that it suggested several alternatives to the agency, including different CV values or a different statistical metric for Element 3 and the use of

industry funding and different procedures to modify observer allocation for Element 6, but they were not considered.  (Pl.'s Mot. at 42-43.)

"[C]ourts apply a 'rule of reason' in assessing whether an agency considered a sufficient range of alternatives."  *Oceana I*, 2005 WL 555416, at *7.  "The range of options considered by the agency is 'bounded by some notion of feasibility,' and a 'detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.'"  *Id.* (quoting *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 551).  "Moreover, '[t]he goals of an action delimit the universe of the action's reasonable alternatives.'"  *Id.*  (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999)).  As such, "an agency need not consider options inconsistent with the action's purpose."  *Id.*

Here, the Court concludes that NMFS' consideration of alternatives[32] in the EA was sufficient to meet the requirements of NEPA.  With respect to Element 3, the EA clearly states

---

[32] The agency's October 15, 2007 response to public comments on the SBRM Amendment noted that

> As described throughout the amendment (the Executive Summary and chapters 6, 7, and 8), the alternatives considered by the Councils were structured around seven specific elements that together comprise the Northeast Region SBRM. Multiple alternatives were developed and considered for each element and, in some cases, various sub-options were also developed and considered.  As noted in Appendix E of the amendment, in response to a similar comment received on the draft amendment, the available permutations of the various alternatives considered in this action exceeds 1,400 if the sub-options are not counted. Accounting for the sub-options, the number of possible outcomes exceeds 2,100 sets of management alternatives.  In addition to the sets of alternatives expressly analyzed in the EA, the Councils considered, but ultimately rejected from detailed analysis, an additional  four distinct alternatives.

(AR 3232.)  The Amendment itself also states:

that beyond just the "status quo" and the 30 percent CV level that was adopted, the Regional

Councils "considered an approach that would have attempted to establish a separate and distinct

CV level for each particular combination of fishing mode and species" as well as "whether an

alternative percentage (15 percent, 20 percent, 40 percent, etc.) should be selected instead." (AR

3474.) The EA goes on to explain that there is a "lack of scientific justification for CV values

outside the range recommended [20-30 percent] by the National Working Group on Bycatch"

and "[e]ven within this range, there is little scientific justification for choosing one CV level

(e.g., 28 percent) over any other specific CV level (e.g., 27 percent)." (*Id.*) The EA then states

that separate CV levels for each fishing mode and/or species "was not pursued further due to

a lack of information necessary to make informed decisions regarding the cell-by-cell

CVs." (*Id.*; *see also id.* 3960 ("In addition to the sets of alternatives expressly analyzed in the

EA, the Councils considered, but ultimately rejected, an additional four distinct alternatives.")

The Court concludes that these "brief discussions" of alternatives considered and rejected

by the agency are adequate under NEPA. *See* 40 C.F.R. § 1508.9(b) (EA shall include "brief

discussions" of alternatives). *Cf.* 40 C.F.R. § 1502.14(a) (in completing EIS, "for alternatives

---

This amendment provides a range of possible outcomes as alternative courses of action, but is organized for the sake of clarity such that for each of seven relatively independent decision points the status quo is compared to between one and three additional alternatives (some alternatives include an additional one to three options). Given the structure of the SBRM Amendment in categorizing the actions under consideration, there are actually 1,464 distinctoutcomes possible for the SBRM to be adopted by the Councils, ignoring sub-options within some of the alternatives. Accounting for the sub-options, the number of different possible outcomes climbs to 2,160.

(*Id.* 3759.)

which were eliminated from detailed study, [the agency need only] briefly discuss the reasons for their having been eliminated," as opposed to "rigorous" exploration and evaluation).

Similarly, the record is clear that the agency considered industry funding and other ways to prioritize spending in the event of funding shortages. For example, the SBRM Amendment includes "provisions for industry-funded observer programs." (AR 3437; *see also id.* 3468 (describing provision in Amendment to allow "development of and/or modifications to an industry-funded observer program, including observer set-aside provisions . . . through a framework adjustment to the relevant FMP"); 3512 (discussing environmental consequences of industry-funded observer programs).) The Amendment allows Regional Councils to establish "either a requirement for industry-funded observers or an observer set-aside program" via this mechanism. (*Id.* 3953.) NMFS also considered other types of prioritization such as those suggested by plaintiff, but they were rejected because "the Councils recognized the importance of retaining sufficient flexibility in the SBRM to adapt to changing conditions and priorities in the fisheries." (*Id.* 3958.) The agency further noted that "retaining some level of discretion in allocating resources is necessary for the agency to adequately meet its obligations under other laws in addition to the Magnuson-Stevens Act, such as the ESA and MMPA." (*Id.*) To the extent the agency concluded that a rigid system of prioritization was unreasonable and/or inconsistent with the SBRM Amendment's purpose, it need not have addressed that option in its EA. *See Oceana I*, 2005 WL 555416, at *7; *see also Citizens Against Burlington, Inc. v. Busey*, 930 F.2d 198, 195 (D.C. Cir. 1991) ("CEQ regulations oblige agencies to discuss only alternatives that are feasible, or (much the same thing) reasonable."). Accordingly, the Court finds that the agency meaningfully considered alternatives in developing the SBRM Amendment and completing its EA.

## CONCLUSION

The SBRM Amendment is a comprehensive, detailed document reflecting NMFS' best efforts to comply with this Court's earlier orders. For the reasons set forth herein, the Court concludes that the agency's actions in developing and approving the Amendment were reasonable and in accordance with the law. Accordingly, the Court will grant defendants' motion for summary judgment, and it will deny plaintiff's motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  July 23, 2010